[No. 4027–II.   Division Two.   June 9, 1980.]

JOHN MOLONEY, ET AL, *Appellants,* v. TRIBUNE
PUBLISHING COMPANY, ET AL, *Respondents.*

*Wayne J. Wimer,* for appellants.

*Valen H. Honeywell* (of *Gordon, Thomas, Honeywell, Malanca, Peterson & O'Hern*), for respondent Tribune Publishing Co.

*William Robert Hickman* (of *Reed, McClure, Moceri & Thonn, P.S.*), for respondents Pierce County, et al.

PEARSON, J.—Plaintiffs appeal from a summary judgment dismissing their suit claiming invasion of privacy and outrage against the Tacoma News Tribune, Pierce County, and certain employees of Pierce County. We find it necessary to address only two issues: first, whether Pierce County and its employees are immune from liability for mistakes made in the course of criminal investigations and the disclosure of investigation information; and second, whether the Tribune is protected from liability for publishing a substantially accurate summary of the county's investigation report concerning an event of immediate public interest. We affirm the order of summary judgment based on the resolution of these issues.

On a night during the Christmas holidays of 1973, plaintiffs' 15–year–old daughter ran approximately 3 miles from the home of her sister to the home of her parents in Auburn. She entered their home at around 3:30 a.m. wearing only her panties and bra, crying and disheveled. She indicated that she had been assaulted and that she had thrown away her clothes because they made her feel dirty. The clothes were given to her by her boyfriend, and she declared she wanted nothing more to do with him. The next day the girl and her father retrieved her clothes from the side of the road where she had left them, 6 blocks from her parents' home. The girl learned later that she was pregnant. She married her boyfriend in September of 1974 and gave birth to their child the same month. They took up residence in a house near the Sumner–Orting road.

In the early morning hours of December 4, 1974, the nude body of plaintiffs' daughter was found in the middle of the Sumner–Orting road, 1 1/2 miles north of her residence. Her bathrobe and panties were found folded alongside the road about a mile south of the body. A houseguest had seen her walk outside during the night. Her husband told police that she had feared she was pregnant again. A motorist had seen a girl running naked near the road earlier in the morning. Police suspected a hit–and–run accident from the nature of the girl's injuries.

On December 5, 1974, the Tacoma News Tribune published an article quoting Pierce County Sheriff's Department spokesman Ernest Keck in pertinent part, as follows:

> The victim's parents told Keck that their daughter "streaked" from the Town of Pacific to Auburn about a year ago. They said she was high on drugs at the time. . . . [R]esults of a blood test would be analyzed to see if [the victim] was under the influence of drugs at the time of her death.

On December 8, 1974, the defendant newspaper published an obituary identifying the deceased girl as the daughter of plaintiffs, of Auburn, Washington, and identifying other members of the family. This reporting made no references to the circumstances of her death or the previous incident.

Plaintiffs assert, in part, that summary judgment was improperly granted because the affidavits submitted by the parties raise a genuine issue of fact as to whether Keck inaccurately attributed to the girl's parents the statements that she "streaked" and was "high on drugs." There was some evidence that these statements originated with the victim's husband, rather than with her parents.

A party moving for summary judgment has the burden of initially proving by uncontroverted facts that there is no genuine issue of material facts, *i.e.,* facts upon which the litigation's outcome depends. *Ohler v. Tacoma Gen. Hosp.,* 92 Wn.2d 507, 598 P.2d 1358 (1979). For the reasons stated below, we hold the county to be immune from civil liability for the public statements of its agent.

■■ Whether or not Captain Keck's disclosures were in error, a public officer performing an official act which is properly categorized as discretionary is immune from tort liability for such performance. *Clipse v. Gillis,* 20 Wn. App. 691, 582 P.2d 555 (1978). A discretionary function is one involving a basic governmental policy, program, or objective requiring the exercise of a basic policy evaluation, judgment, and expertise on the part of the officer or agency; it is essential to realization of the policy and within the proper authority and duty of the officer or agency. *Bergh v. State,* 21 Wn. App. 393, 585 P.2d 805 (1978); *Clipse v. Gillis, supra. Clipse* held that the investigation of criminal complaints by police officers was a discretionary act for which they may not be held personally liable. The rule seems equally applicable to the release of investigation information by a police department spokesman, since judgment and discretion would necessarily be exercised in determining the public's need to know and in deciding how much information could be released without obstructing further investigation in the circumstances of each case.

It is significant that the victim was found dead at a time when certain spectacular murders involving young women were an ongoing source of public anxiety. We think the county's decision to disclose investigative information in these circumstances served the public's legitimate interest in whether the victim's death was another of this type of homicide or was simply attributable to a hit–and–run accident. The fact that she had previously run down the street at night without her clothes was a potential explanation for the bizarre circumstances of finding her nude body in the middle of the road.

For these reasons, we hold the county is immune from tort liability for disclosure by the deputy sheriff of information acquired during investigation of the potential homicide. We further hold this immunity applies whether or not that information later proved to be inaccurate.

■ The next question is whether the Tribune was protected from liability as a matter of law in publishing an

article substantially in accord with the sheriff's investigative report.[1] In the related context of defamation the Restatement (Second) of Torts § 611 (1977) provides:

> The publication of defamatory matter concerning another in a report of an *official action* or proceeding or of a meeting open to the public *that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported.*

(Italics ours.) The privilege stated in this section is a qualified privilege commonly exercised by newspapers, broadcasting stations, and others who are in the business of reporting news to the public. Restatement (Second) of Torts § 611, comment *c* (1977). The reason underlying the privilege is the interest of the public in receiving information concerning official action or proceedings and public meetings. The privilege permits the media to publish by means of a general publication reports of any official action or proceeding or of a public meeting that deals with a matter of public concern. Restatement (Second) of Torts § 611, comment *b* (1977).[2] This comment distinguishes between the privileged act of quoting an official report which contains false statements and the unprivileged act of publishing false statements with no indication of their official source.

---

[1]With the exception of the word "streaked," the publication is fully supported by the sheriff's investigation report. *Webster's New World Dictionary, Second College Edition* (1976), defines "streak" in the present context as: "to engage in the prank of dashing naked for a short distance in a public place."

While the plaintiffs' daughter was partially disrobed rather than naked, and her emotional state at the time of the incident did not indicate a prank—"Victim was talking about the devil and was out of her head," according to the investigation report—the Tribune's use of the word "streaked" was an ill-chosen embellishment, not a material falsehood.

[2]While comment *b* of Restatement (Second) of Torts § 611 (1977) would extend the privilege even where the publisher knows the report contains false or defamatory statements, it is unnecessary for us to adopt or approve that portion of the comment; here there is no evidence the Tribune knew the information supplied by Captain Keck was incorrect.

The filing of a report by an officer or agency of the government is an action bringing a recounting of the governmental report within the scope of the privilege. Restatement (Second) of Torts § 611, comment *d*. *See also Buchanan v. Associated Press,* 398 F. Supp. 1196 (D.D.C. 1975); *Whitcomb v. Hearst Corp.,* 329 Mass. 193, 107 N.E.2d 295 (1952).

Generally a qualified privilege concerning a public official or public figure is not lost unless the defamatory statements are published with malice, *i.e.,* knowledge of their falsity or reckless disregard of the truth. *See, e.g., New York Times Co. v. Sullivan,* 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710, 95 A.L.R.2d 1412 (1964); *Henderson v. Teamsters Local 313,* 90 Wn.2d 666, 585 P.2d 147 (1978). The standard is somewhat modified for the qualified privilege concerning reports of official action relating to a private person. The plaintiff in this situation must show fault by the publisher in not acting reasonably to insure that the report is accurate and complete or a fair abridgement. Restatement (Second) of Torts § 611, comment *b* (1977).

The article in the present case published information received directly from an official investigation report, hence it arose from "official action." It is significant that the Tribune attributed the statements concerning streaking and drug abuse to a communication between the parents and Captain Keck. We think the Tribune acted reasonably under the circumstances in relying upon information supplied by the designated spokesman of the sheriff's department, particularly since the article identified him as a source, without seeking out the victim's parents for corroboration. The circumstances of the girl's death constituted "hot news"—an event of immediate public concern. The publisher was acting within the limited deadlines characteristic of a metropolitan newspaper, and the record does not suggest that the writer of the article entertained serious doubts as to its truth. We decline to hold that the restrictions and limitations which have hedged about defamation for so many years can be bypassed in the present case by

bringing an action for invasion of privacy after the running of the statute of limitation for defamation.[3] *See* W. Prosser, *Handbook of the Law of Torts* 839 (4th ed. 1971). If the report of an official public action or proceeding is accurate or a fair abridgement, an action cannot constitutionally be maintained, either for defamation or for invasion of the right to privacy. *See* Restatement (Second) of Torts § 611, comment *b* (1977).

We affirm.

REED, C.J., and PETRICH, J., concur.

Reconsideration denied July 15, 1980.

Review denied by Supreme Court October 10, 1980.

---

[3]Plaintiffs did not bring this action within the 2–year statute of limitation applicable to libel and slander. RCW 4.16.100.