[No. 51004–1.   En Banc.   August 22, 1985.]

ELMER J. TURNGREN, ET AL, *Petitioners*, v. KING COUNTY, ET AL, *Respondents*.

294

Timothy K. Ford, Michael E. Withey, and Daniel Hoyt Smith, for petitioners.

Norm Maleng, Prosecuting Attorney, and Michael C. Duggan, Deputy, for respondent King County.

Waitt, Johnson & Martens, by Barry M. Johnson, for respondent City of Redmond.

DORE, J.—The issue in this case is whether the Court of Appeals properly upheld the trial court's summary dismissal of a civil action which the Turngren family filed against King County, the City of Redmond, and others. We hold that the Turngrens established a prima facie case for malicious prosecution, false arrest and false imprisonment, and libel and slander, but not for violation of federal civil rights. We reverse and remand for trial in accordance with the provisions of this opinion.

## FACTS

On May 1, 1979, Elmer and Marie Turngren and their children filed the present action against King County, the King County Department of Public Safety, the City of Redmond, its police department, and 15 John Does alleged to be employees, agents, and officers of the other defendants. The Turngrens' complaint alleges the following: In October 1978, one of the John Does knowingly and falsely

told several police officers that he had seen 4 M–16 automatic rifles, 15 hand grenades, and a pipe bomb in the Turngrens' home. Detectives Rutherford and Niehl, knowing the informant's statements to be false, intentionally repeated the informant's allegations in an affidavit of probable cause and thereby obtained a warrant to search the Turngrens' home. On the evening of October 27, 1978, approximately 30 officers, including a SWAT team, sharpshooters, and federal officers, converged on the Turngrens' home to execute the warrant. Some of the officers contacted the Turngrens' neighbors and told them to leave the area because there might be trouble in the neighborhood.

The complaint further alleged that the officers made Mr. and Mrs. Turngren and their 10–year–old daughter Merri come out of the house at about 10:30 p.m. and stand at gunpoint on the front lawn while the house was searched. Finally, the Turngrens alleged that the police information officer issued press releases which described the informant as reliable, that the weapons had been present in the house but had been removed prior to the search, that the police did their homework well, that the informant feared for his life, and the Turngrens' home was in a messy state before the raid. No contraband was found in the search.

Based upon these factual allegations, the Turngrens sought damages for: (1) false arrest and false imprisonment; (2) invasion of privacy, causing severe emotional distress; (3) trespass; (4) defamation; (5) excessive use of force in executing the search warrant; (6) negligence on the part of the officers in performing their duties; (7) negligence on the part of the City and County in failing to provide proper training and in retaining the officers; and (8) violation of 42 U.S.C. § 1983 (1976).

In their answers, the City and County admitted that the John Doe officers were acting under color of state law and in the course and scope of their duties at the relevant times. Both asserted sovereign immunity as an affirmative defense.

All 15 John Does (including the informant) were subse-

quently dismissed from the action on stipulation of the parties.

During discovery, the Turngrens' attorney learned that the informant's name was Robert Smith. Smith's representations to Redmond Police Detective Niehl and King County Police Detective Rutherford were the sole source for the issuance of the warrant and search of the Turngrens' home. The incident that touched off the search of the Turngrens' home occurred 1 day before the search when a Redmond businessman, Chris Leavitt, brought a .38 caliber pistol into the Redmond Police Department. Leavitt told Detective Niehl that he had purchased the pistol from Robert Smith and he believed it was stolen. Leavitt informed Niehl that Robert Smith was "a downright liar" and couldn't be trusted. Clerk's Papers, at 1370.

Detective Niehl knew Robert Smith as an informant for the Redmond Police Department under Niehl's direct supervision and control. Smith had a juvenile record, had escaped from Echo Glen Juvenile Home on a number of occasions, and had a criminal record. Niehl was also aware that Smith had been convicted of an auto theft charge and was then on probation.

Detective Niehl contacted King County Police Detective Rutherford, who ascertained that the pistol had been stolen from a King County residence. Detectives Niehl and Rutherford then contacted Smith and interrogated him about the stolen pistol. It was only then that Smith told the detectives that he knew where other firearms were located in the Juanita–Kirkland area. Smith said he had heard this information secondhand. The detectives instructed Smith to go back and find the location and owner of the firearms. Niehl and Rutherford's plan was to have the informant attempt to obtain another firearm that they could verify had been stolen in order to corroborate Smith's allegations. Niehl and Rutherford then drove Smith to the Juanita area where Smith was dropped off and instructed to make contact when he found out where the firearms were located.

Smith called Niehl back the next day, claiming that he

had seen grenades and automatic weapons at a house in the Kirkland–Juanita area. Rutherford was then contacted, picked up Smith, questioned him, and drove him past a residence in Kirkland which he pointed to. Smith stated he'd been in the house, met a biker and he smoked some dope and handled some guns, some of which he felt were automatic weapons. Rutherford then directed Smith to give him a statement in which Smith stated he observed revolvers, M–16 machine guns, boxes of hand grenades, marijuana, psilocybin mushrooms frozen in the freezer, and three Harley–Davidson motorcycles in the front living room of the house. Smith said the house was occupied by three young males, and gave a vague description of one of the occupants of the house as a Hell's Angels warlord named "Keith".

Instead of obtaining independent corroboration of Smith's claims, the officers simply obtained repeated descriptions from Smith of what he saw in the house. The minimal investigation conducted revealed facts which contradicted Smith's claims: it was learned that the house and the car outside it were owned by an Elmer Turngren, who was retired, and who lived in the house with his wife, Elizabeth, a former employee of the Kirkland Police Department. Also learned was that the Turngrens had a daughter, Merri Angelie, and two sons, Keith and Kirk.

Rutherford and Niehl prepared an affidavit in support of a search warrant. The affidavit said nothing about what had been learned about the Turngrens. Nor was the informant Smith's prior criminal history or possible interest in cooperating with the police revealed in the affidavit. The informant's reliability was simply represented by a statement that he had given more than 10 reports on criminal activity in the Redmond–Bellevue area which were personally verified by Detective Niehl.

In the process of obtaining the search warrant, the informant Smith was made available to District Judge Stokes to whom the warrant application was made, but no additional evidence was recorded to support the issuance of the war-

rant. On the basis of the affidavit, Judge Stokes signed the warrant.

After the search of the Turngrens' home, Smith left town and went to Louisiana, where he was sentenced to 5 years in prison for burglary. When interviewed informally in prison, Smith stated that he had lied when he told the officers that he had seen weapons in the Turngrens' home. Smith also claimed that he told the officers before the raid that the Turngrens' house was the "wrong one".[1] Smith said that Detective Niehl told Smith that it was "too late"

---

[1] An excerpt from a tape, reduced to written form, of an interview between Michael Withey representing the Turngrens and Robert Smith who was in Angola State Penitentiary is as follows:

[Smith] They were clearing people out of the house and out of the neighborhood and I also received the message that they were clearing out around the wrong house. So I

[Withey] What did you do?

[Smith] I told Gary Niehl and he pulled me aside and said that I was a good informant and that I had to have been right and he said he stuck his neck out for me and it went on from there.

[Withey] Ok. Then did you say anything about it being the wrong house?

[Smith] Yes I did. I told him it was *the wrong house.*

[Withey] And what did Niehl or Rutherford say after that?

[Smith] Rutherford didn't say nothing because Niehl pulled me away from him.

[Withey] Ok, what did Gary Niehl say?

[Smith] Gary Niehl said that it has to be the right house because I stuck my neck out. He says you, I stuck my neck out to prove you're a good informant.

[Withey] Did he say anything about "we can't back out of now" or anything like that?

[Smith] Yes he did. He said it's too late now, we're [sic] already talked to the judge about it.

. . .

[Withey] Did you realize then that it was the wrong house?

[Smith] Yes, I did.

[Withey] Ok. So what happened with respect to Niehl or after that?

[Smith] I didn't hear from Rutherford at all. I heard from Gary Niehl, telling me that, he called me up and says "Hey, it's all right, maybe he just moved the stuff out or something before we got there, maybe he was tipped off or something like that."

[Withey] Did you tell him no it was the wrong house?

[Smith] Yes, I did.

Clerk's Papers, at 1159.

because Niehl had already "stuck his neck out" by overstating Smith's credibility, both in the affidavit of probable cause and to the magistrate who signed the warrant. Smith also indicated that Niehl constantly held the probation violation over his head if he refused to cooperate, and told him to leave town after the unsuccessful raid on the Turngrens. Clerk's Papers, at 1159, 1170.

When Smith was later deposed, he admitted making the prison statements, but claimed that they were lies. This time, Smith said that he had become angry with Niehl when the Turngrens' attorney showed up at the prison, because Smith believed that Niehl had disclosed his identity. In the deposition, Smith swore that he had never lied to Niehl.

Detective Niehl was deposed at length regarding alleged discrepancies between his description of Smith's reliability in the affidavit of probable cause and Smith's actual "track record" as an informant. In the affidavit, Niehl had stated that he had received "more than 10 reports on criminal activity [from Smith] . . . which were personally verified by [Niehl] through regular police channels . . ." Clerk's Papers, at 1721. At the deposition, however, Niehl was able to remember only five reports, of which one dealt with Smith's own crime and only one other of which was verified. None of this information resulted in criminal convictions. Nonetheless, Niehl testified that he still believed in Smith's veracity.

All of the police officers who were deposed said that, in connection with the Turngren case, they had been executing ordinary police policies rather than making policy decisions themselves.

The trial court granted the City and County defendants' motions for summary judgment. The Court of Appeals affirmed in a split decision. The majority held that summary judgment was proper as to all of the common law tort claims because "the record does not raise a reasonable inference of malicious or reckless conduct on the part of the detectives". *Turngren v. King Cy.*, 33 Wn. App. 78, 82, 649

P.2d 153 (1982) (*Turngren* I). The court relied for this conclusion on *Clipse v. Gillis,* 20 Wn. App. 691, 582 P.2d 555 (1978) and *Moloney v. Tribune Pub'g Co.,* 26 Wn. App. 357, 613 P.2d 1179, *review denied,* 94 Wn.2d 1014 (1980). With respect to the civil rights claim under 42 U.S.C. § 1983, the majority held that summary judgment was proper because the record "raises no reasonable inference that the allegedly wrongful actions of the individual detectives were done pursuant to an official policy or custom." *Turngren* I, at 85.

This court initially deferred consideration of the Turngrens' petition for review from the *Turngren* I decision pending a final decision in *Chambers–Castanes v. King Cy.,* 100 Wn.2d 275, 669 P.2d 451 (1983). Before that decision was filed, the Turngrens moved for summary reversal in light of *Bender v. Seattle,* 99 Wn.2d 582, 664 P.2d 492 (1983), where this court overruled *Clipse* and *Moloney* on the immunity issue. This court denied that motion, but granted the Turngrens' petition for review and remanded in light of *Bender. Turngren v. King Cy.,* 100 Wn.2d 1007 (1983).

On remand, the Court of Appeals adhered to its original decision. The majority stated that the reference in the court's original decision to lack of malice was not intended to refer only to the concept of sovereign immunity. *Turngren v. King Cy.,* 38 Wn. App. 319, 321–22, 686 P.2d 1110 (1984) (*Turngren* II). The Court of Appeals first noted that, under *Bender,* "there is no longer *absolute* immunity from such claims". *Turngren* II, at 322. After characterizing petitioners' common law claims as a single claim for malicious prosecution, the court then concluded that petitioners' pleadings do not raise a triable issue even as to an abuse of the narrower, "qualified privilege" which is recognized in *Bender. Turngren* II, at 322. The Court of Appeals again affirmed the trial court's dismissal of the complaint.

## CAUSES OF ACTION

In both *Turngren* I and II, the Court of Appeals treated

only the Turngrens' defamation claim as a unique tort claim. The court treated the remaining tort claims as a single allegation of malicious prosecution.

Cases such as this one, where wrongful issuance of a search warrant is alleged, are malicious prosecution actions. As the Supreme Court of Oregon observed, "[i]t is well supported by authority that to cause a search-warrant to be issued maliciously and without proper cause, is malicious prosecution for which an action will lie". *Nally v. Richmond,* 105 Or. 462, 466–67, 209 P. 871, 872–73 (1922). Although the Supreme Court of this State has not expressly defined a tort action based on the alleged wrongful issuance of a search warrant as a "malicious prosecution" action, that is the effect of its holdings in such cases. *See Ton v. Stetson,* 43 Wash. 471, 474, 86 P. 668 (1906); *Ladd v. Miles,* 171 Wash. 44, 45, 17 P.2d 875 (1932).

*Turngren* II, at 323; *see also Turngren* I, at 82–84. Petitioners contend that this analysis not only ignores their remaining claims, but also conflicts with *Bender v. Seattle,* 99 Wn.2d 582, 664 P.2d 492 (1983). We agree.

■■ The plaintiff in *Bender* brought suit against the City based on allegations of false arrest and false imprisonment, malicious prosecution, and libel and slander. Bender's primary contention was that a full disclosure of all information and a proper investigation by the police would have prevented the issuance of search and arrest warrants and filing of criminal charges. *Bender,* at 584–86. On appeal from a verdict in favor of Bender, the Court of Appeals held that the City was entitled to a directed verdict on the false arrest or false imprisonment claim because Bender's arrest was pursuant to a facially valid warrant. *Bender,* at 584. This court reversed, holding that Bender had a cause of action for false arrest and false imprisonment and further found there existed sufficient evidence to go to the jury on this cause of action. *Bender,* at 590–93. In holding that Bender had a cause of action for false arrest or false imprisonment, we carefully differentiated this cause of action from that of malicious prosecution.

> The gist of an action for false arrest or false imprisonment is the unlawful violation of a person's right of personal liberty or the restraint of that person without legal authority: . . . The gist of an action for malicious prosecution, on the other hand, does not necessarily involve an interference with personal liberty, but rests on malice and want of probable cause.

(Citation omitted.) *Bender,* at 591. The *Bender* court then went on to emphasize that "the existence or nonexistence of malice is immaterial to the question of liability for false arrest or false imprisonment." *Bender,* at 591.

In considering petitioners' false arrest and false imprisonment claims together with their malicious prosecution claim, the Court of Appeals, contrary to *Bender,* required petitioners to show malice in order to prevail on the former two claims.

The Court of Appeals appears to have misread prior Washington law to the effect that all tort actions based on the alleged wrongful issuance of a search warrant are actions for malicious prosecution. In *Ladd v. Miles,* 171 Wash. 44, 17 P.2d 875 (1932), the court simply concluded that the circumstances of the case seemed generally to "possess the characteristics of an action for malicious prosecution" and that "'. . . search proceedings, when maliciously instituted, or prosecuted without probable cause, may be made the basis of an action for malicious prosecution.'" *Ladd,* at 45 (quoting *Olson v. Haggerty,* 69 Wash. 48, 124 P. 145 (1912)). The case further holds that whether the sheriff disclosed sufficient material facts to establish probable cause was an issue for the jury. Since malice was inferable from lack of probable cause, it was unnecessary to consider alternative causes of actions:

> The acts of the sheriff and his deputies under such a warrant might perhaps render them liable in an action in trespass in which malice need not be shown; but whether so or not, the warrant having been issued without probable cause, the jury may infer malice.

*Ladd,* at 53. *See also Ton v. Stetson,* 43 Wash. 471, 86 P. 668 (1906) (malicious prosecution only cause of action

instituted by appellant).

The Court of Appeals erred in combining the Turngrens' false arrest and imprisonment cause of action into a single malicious prosecution cause of action.

### FALSE ARREST AND FALSE IMPRISONMENT

Our decision in *Bender* also shows that petitioners' pleadings and supporting documents are sufficient to resist the defendants' motion for summary judgment on the false arrest and false imprisonment claims. In *Bender,* this court noted the general rule that an officer will not be held liable for false arrest if he acts pursuant to a facially valid warrant. *Bender,* at 591. This court also stated, however, that liability may attach if that officer was in a position to control the flow of information to the magistrate.

> A different situation is presented, however, when the same officer provides information to obtain the warrant and then also executes the warrant. When one officer serves both functions, he is not merely directed to fulfill the order of the court; he is in a position to control the flow of information to the magistrate upon which probable cause determinations are made. We see no distinction between an officer who makes an invalid, warrantless arrest and one who knowingly withholds facts in order to obtain a warrant. No policy is served by extending the nonliability rule of *Pallett* [*v. Thompkins,* 10 Wn.2d 697, 118 P.2d 190 (1941)] and *Cavitt* [*v. McCrite,* 194 Wash. 684, 79 P.2d 637 (1938)] in false arrest cases when an officer simply interposes a magistrate between himself and the arrested individual. When the same officer seeks the warrant and executes it, he should not be allowed to "cleanse" the transaction by supplying only those facts favorable to the issuance of a warrant. The exception we now announce to the general nonliability rule of *Pallett* and *Cavitt* only prevents an officer from asserting the facial validity of a warrant as an absolute defense to a false arrest or false imprisonment action. The officer can still establish a defense to such an action by proving, to the satisfaction of the jury, the existence of probable cause to arrest under the circumstances.

(Footnote omitted.) *Bender,* at 592. Here, petitioners have alleged that two of the defendant officers deliberately con-

veyed false information to the magistrate in order to obtain the search warrant. If petitioners can prove this allegation at trial, respondents could be held liable for false imprisonment under *Bender.*

### MALICIOUS PROSECUTION

██ Petitioners also challenge the Court of Appeals analysis of their malicious prosecution claim. They rely in part on *Ladd v. Miles, supra,* where this court held that a malicious prosecution action will lie for the wrongful issuance of a search warrant. This court also held in *Ladd* that, if the defendant caused the warrant to be issued without probable cause, "the jury may infer malice." *Ladd,* at 53; *see also Peasley v. Puget Sound Tug & Barge Co.,* 13 Wn.2d 485, 502, 125 P.2d 681 (1942) (malice inferred from proof of reckless disregard of the rights of the plaintiffs). The Court of Appeals noted this rule, but evidently held that it does not apply here. The court appears to fault petitioners for failing to set forth specific facts raising a genuine issue of fact as to malice. Petitioners have, however, alleged the following: (1) that no contraband or evidence of a crime was discovered in the search; (2) that, before the search was conducted, the informant who had claimed there would be contraband or evidence in that home had told police he was mistaken; (3) that informant's past record of reliability was grossly misrepresented in the search warrant affidavits; (4) that the police failed to investigate regarding the informant's allegations before the search, and ignored contrary evidence and explicit warnings that they had the wrong house.

In *Bender,* this court held that in an action for malicious prosecution, a prima facie case as to the absence of probable cause exists if there are factual issues regarding a lack of full disclosure of material facts to the prosecutor.

> [I]f any issue of fact exists, under all the evidence, as to whether or not the prosecuting witness did fully and truthfully communicate to the prosecuting attorney, or to his own legal counsel, all the facts and circumstances within his knowledge, then such issue of fact

> must be submitted to the jury with proper instructions from the court as to what will constitute probable cause, and the existence or nonexistence of probable cause must then be determined by the jury. . . . [T]he requirement that malice be shown as part of the plaintiff's case in an action for malicious prosecution may be satisfied by proving that the prosecution complained of was undertaken from improper or wrongful motives or in reckless disregard of the rights of the plaintiff.

(Italics omitted.) *Bender,* at 594 (quoting *Peasley v. Puget Sound Tug & Barge Co., supra*).

> This language in *Peasley* [*v. Puget Sound Tug & Barge Co.,* 13 Wn.2d 485, 125 P.2d 681 (1942)] makes it unmistakably clear that if a factual issue as to probable cause or malice exists, the question must be submitted to the jury. The credibility of witnesses and the weight to be given the evidence are matters that rest within the province of the jury[.]

*Bender,* at 594–95.

◼ The underlying basis for the Court of Appeals affirmance of summary judgment on the malicious prosecution cause of action is its rejection of an affidavit setting forth information obtained from the informant which would tend to show that the detectives maliciously or recklessly misrepresented material facts in the affidavit in support of the search warrant. The court held that the unsworn and unsigned statement of the informant reported by counsel for the Turngrens is hearsay, admissible only to impeach the credibility of the informant's deposition testimony and, as such, cannot create an issue of material fact. *Turngren I,* at 83 n.3. The court based its holding on *Barrie v. Hosts of Am., Inc.,* 94 Wn.2d 640, 643–44, 618 P.2d 96 (1980) where this court held that an attorney's affidavit containing hearsay evidence cannot, standing alone, create a genuine issue of fact for the purposes of a summary judgment proceeding even though the affidavit may be used to impeach an opposing affidavit. Such a reasoning ignores the fact that the informant later admitted under oath that he made the statements, but said he lied, a fact itself admissible on the

material issue of the informant's veracity. Additionally, the Court of Appeals holding appears to ignore several possible avenues through which the statement could be admitted at trial to prove the facts asserted.[2] In a closely analogous situation, this court held that attorney affidavits are entitled to consideration in a summary judgment proceeding.

> In the instant case, plaintiff's counsel averred he was present and heard the statements he asserts were made . . . Under appropriate circumstances plaintiff's counsel could so testify. What the circumstances might be which would give rise to the necessity or the admissibility of such testimony would depend, in a large measure, upon the course of the trial and the foundation thereby erected. In any event, the requisite testimonial knowledge was evidenced by the pertinent affidavits, and the admissible content thereof was entitled to consideration in the summary judgment proceeding.
>
> . . .
>
> . . . The opposing affidavits are therefore contradictory and raise credibility questions revolving about a material and decisive issue in the case. However complex and intricate plaintiff's problem of proof at the time of trial may be, plaintiff at this stage of the proceeding is entitled to all favorable inferences that may be deduced from the varying affidavits. So viewing the affidavits, we are satisfied respondents have not met their burden of demonstrating the absence of a genuine issue of material fact. Mere surmise that plaintiff may not prevail at trial is not a sufficient basis to refuse her her day in court.

(Citations omitted.) *Meadows v. Grant's Auto Brokers, Inc.,* 71 Wn.2d 874, 880–82, 431 P.2d 216 (1967).

Additional evidence independent of the informant's statement, in the form of the detectives' depositions, raises an issue of material fact in regard to the detectives' full disclosure of the facts relating to the informant's reliability

---

[2]Several possible avenues exist through which the informant's prison statements could be admitted at trial. If the informant recants his recantation, or reverses his deposition testimony, the statements are admissible under ER 801(d)(1). If the informant is available at trial, the statements may be admitted as impeachment; and if the informant is unavailable for trial, they may be admissible under ER 804(b)(3).

and the amount of independent corroboration of the informant's story. The importance of full disclosure of the facts relating to the informant's reliability is underscored by the seriousness of his accusations and the fact that the detectives obtained minimal independent corroboration of the informant's story. Prior to applying for the warrant, the detectives verified that someone named "Keith" lived at the Turngren residence, but no further independent investigation of the material facts was made. While the affidavit relates that the informant stated he personally viewed weapons and drugs at the Turngren residence, it fails to relate important facts surrounding the circumstances of giving of the informant's tip. The affidavit gives the impression that the informant voluntarily came forward to assist the police with information concerning criminal activity. In actuality, the informant's statements, given in response to police questioning about his own criminal activity, could be construed as an effort to exculpate himself and turn police interest away from his own crimes.

None of this history appeared in the affidavit for the search warrant, nor was it told to the magistrate who signed the warrant. The failure of the detectives to reveal to the magistrate the basis for the informant's cooperation is highly significant. From this can be inferred a reluctance on the part of the detectives to relate vital information which might have resulted in a denial of the warrant pending further investigation.

The affidavit in support of search warrant, indicating that the informant gave more than 10 reports on criminal activity in the Redmond–Bellevue area which were personally verified by the detective is grossly misleading when compared with the informant's actual track record, and contains significant omissions as to the informant's own prior criminal activity known to the detective. It also fails to set out the informant's interest in cooperating with the police.

These misstatements and omissions are not corrected by the fact that the informant was brought before the magis-

trate issuing the warrant. Redmond Detective Niehl in his deposition says he is not sure that the informant was asked any questions by the magistrate. There is no record that the magistrate relied on any evidence other than the affidavit. On the face of the affidavit itself are the judge's handwritten words, "informant present and". Nothing further was added, however, which indicates that the judge intended to question the informant but did not. *See* CrR 2.3(c). King County Detective Rutherford states that the informant was asked only about his prior knowledge of weapons and his concern for his personal safety and that Redmond Detective Niehl gave no further background information in response to a question from the magistrate, but merely stated his conclusion that the informant was reliable.

Petitioners' affidavits in opposition to the motion for summary judgment appear sufficient to raise a genuine issue of material fact as to the existence of probable cause for issuance of the warrants. If the petitioners are able to prove this allegation, the jury would be permitted to infer malice under *Peasley* and *Ladd.* The evidentiary facts are disputed and different inferences may be drawn from the facts. A prima facie want of probable cause, together with the discrepancies between the informant's track record as set out in the affidavit and in the deposition, permits an inference of malice sufficient to survive summary judgment.

LIBEL AND SLANDER

This court in *Bender v. Seattle,* 99 Wn.2d 582, 664 P.2d 492 (1983) held that law enforcement officers have a qualified privilege when releasing information to the public or news media concerning official activities. *Bender,* at 601. A person abuses the qualified privilege by making a statement knowing it to be false or with reckless disregard as to its truthfulness. *Bender,* at 601–02.

In the present case, the conduct most particularly complained of is the King County police officers' press statements subsequent to the execution of the search warrant.

The Turngrens contend that the officers acted with reckless disregard for the truth by making subsequent statements that the informant was reliable, that the weapons had been present in the house but had been removed by Keith prior to the search, that the police did their homework well, that the search was not a hit and miss thing, that the informant feared for his life, and that the home was in a messy state before the search.

The affidavit of Steve Miletich, reporter for the Daily Journal–American, states that the statements quoted in his articles were made to him by the police. Some of these statements have been denied by King County public information officer Pat Ferguson. Officer Ferguson stated in his deposition that he spoke with Detective Rutherford concerning the search for only 3 or 4 minutes and made no further investigation to determine the facts related to the execution of the search warrant.

In order to defeat a motion for summary judgment based upon a qualified privilege, the party prosecuting an action for libel and slander must meet the limited burden of presenting specific facts creating a genuine issue as to the question of whether the defendant's statements were made after a fair and impartial investigation or upon reasonable grounds for belief in their truth. *See Twelker v. Shannon & Wilson, Inc.,* 88 Wn.2d 473, 479, 564 P.2d 1131 (1977).

Our examination of the record satisfies us that the Turngrens have met this burden. The record contains an affidavit indicating that certain published statements are attributable to police officers of King County. The deposition of the King County public information officer indicates that little, if any, investigation was conducted prior to release of the information.

The record thus raises factual questions as to the adequacy of the investigation as well as the existence of reasonable grounds for the expressed beliefs in the statement if, in fact, they are attributable to officers of King County.

CIVIL RIGHTS VIOLATION UNDER 42 U.S.C. § 1983

The Court of Appeals also upheld the trial court's dismissal of the Turngrens' section 1983 claim. 42 U.S.C. § 1983 (1976) provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, . . .

Local governing bodies are "persons" within the meaning of this section. *Monell v. Department of Social Servs.,* 436 U.S. 658, 56 L. Ed. 2d 611, 98 S. Ct. 2018 (1978). Moreover, local governmental bodies and their governing officials, if sued in their official capacity, are not immune from liability under 42 U.S.C. § 1983 simply because the alleged violation involves a "discretionary" decision or a "governmental" function. *Owen v. Independence,* 445 U.S. 622, 63 L. Ed. 2d 673, 100 S. Ct. 1398, *reh'g denied,* 446 U.S. 993, 64 L. Ed. 2d 850, 100 S. Ct. 2979 (1980). Accordingly, *Bender's* discussion of discretionary immunity has no effect on the Turngrens' § 1983 action.

There are two essential elements to a § 1983 action: (1) that the conduct complained of was committed by a person acting under color of state law; and (2) that this conduct deprived the plaintiff of a right or privilege secured by the constitution or laws of the United States. *Parratt v. Taylor,* 451 U.S. 527, 535, 68 L. Ed. 2d 420, 101 S. Ct. 1908 (1981). Because the statute prohibits persons from "subjecting" citizens to a deprivation of rights, a municipality cannot be held liable solely on a respondeat superior theory. *Monell,* at 691. Rather, the municipality must, under color of some official policy, "cause" an employee to violate another's constitutional rights. *Monell,* at 692.

In the present case, the conduct most particularly complained of is Detective Niehl's alleged intentional misstatement of material facts in the affidavit of probable cause. There is nothing in the record to indicate that either the

City or the County "caused" Niehl to misstate facts in the affidavit or that either entity has a policy with regard to overstating an informant's veracity to obtain a search warrant. The Court of Appeals followed this reasoning and upheld the trial court's dismissal of the § 1983 action. We agree.

The affidavit of the Turngrens' expert witness, Robert di Grazia, was submitted to the trial court in support of the § 1983 cause of action. Di Grazia's affidavit contends that King County Detective Rutherford failed to sufficiently investigate the reliability of the informant Smith, nor sufficiently corroborate his allegations. This lack of investigation violated King County rules and regulations for obtaining search warrants. Di Grazia concluded from his examination of the depositions of police officers and police reports and police notes that Rutherford stretched the truth when he stated that he repeatedly questioned the confidential informant regarding the said observations and he misstated Smith's past performance as a reliable informant.

These allegations, if proved at trial, do not support a § 1983 claim. No inference can be drawn from di Grazia's affidavit nor from any other evidence in the record that the conduct of Detectives Rutherford or Niehl was the policy or custom of King County or Redmond.

The trial court properly granted the respondents' motions for summary judgment on the § 1983 cause of action.

## CONCLUSION

■ All facts and reasonable inferences must be construed in favor of the nonmoving party in summary judgment. The motion should be granted only if, from all the evidence, reasonable persons could reach but one conclusion. Construing all facts and reasonable inferences in favor of the nonmoving party, we find the Turngrens have established a prima facie case of malicious prosecution, false arrest and imprisonment and libel and slander claims. The

factual issue of whether informant Smith told the arresting officers, prior to executing the search warrant, that the Turngrens' house was the wrong house is sufficient alone to deny defendants' motion for summary judgment of dismissal.

We reverse the Court of Appeals affirmance of the trial court's dismissal of these causes of action and remand to the trial court for further proceedings in accordance with the provisions of this opinion.

DOLLIVER, C.J., UTTER and PEARSON, JJ., and CUNNINGHAM, J. Pro Tem., concur.

SKIMAS, J.* (concurring in part, dissenting in part)— There is no immunity from tort liability when the same police officer provides unreliable information or withholds material information to obtain a search warrant and then also executes the warrant. *Bender v. Seattle,* 99 Wn.2d 582, 664 P.2d 492 (1983). If there is a genuine issue about providing unreliable information or withholding material information, a jury question exists. *Bender v. Seattle, supra.* However, when an officer in an exercise of caution as to the existence of probable cause takes the informant to the prosecutor who questions him at length about probable cause and then presents the informant to a magistrate who places him under oath and further examines him, the situation is different. The issuing magistrate presumably made his own determination of probable cause based on what the informant told him as well as the information contained in the affidavit.

The probability of criminal activity is a determination to be made by the issuing judge. His duty is to ascertain whether the warrant sought is being reasonably requested on reasonable grounds. *State v. Patterson,* 83 Wn.2d 49, 515 P.2d 496 (1973). The determination of probable cause should be given great deference by reviewing courts. *State*

---

*Judge John N. Skimas is serving as a justice pro tempore of the Supreme Court pursuant to Const. art. 4, § 2(a) (amend. 38).

*v. Smith,* 93 Wn.2d 329, 351, 610 P.2d 869, *cert. denied,* 449 U.S. 873, 66 L. Ed. 2d 93, 101 S. Ct. 213 (1980); *State v. Seagull,* 95 Wn.2d 898, 907, 632 P.2d 44 (1981).

There is little in the record to indicate the informant was unreliable or the information provided was not credible at the time the warrant was obtained. He had provided 12 reports of criminal activity on prior occasions which were corroborated by Detective Niehl although only one prosecution resulted. At most it is unclear from the record whether the police officers informed or did not inform the magistrate that the informant was a felon on probation who may have been subject to a probation violation for having been in possession of a stolen firearm.

The fact nothing was found at the residence searched cannot be used to discredit the informant, after the fact, any more than discovery of contraband can be used to establish his credibility. The fact that the informant during discovery in the present action admitted lying to the police does not vitiate the prior finding of probable cause by a neutral and detached magistrate. The allegation that the officers deliberately misled Judge Stokes as to the reliability of the informant is unsupported by any specific facts in the record and merely invites speculation. As noted by Judge Andersen in *Turngren v. King Cy.,* 38 Wn. App. 319, 328, 686 P.2d 1110 (1984) (quoting *Turngren v. King Cy.,* 33 Wn. App. 78, 84, 649 P.2d 153 (1982)):

> "[c]onclusory allegations, speculative statements or argumentative assertions that unresolved factual matters remain are not sufficient to preclude an order of summary judgment."

(Citations omitted.)

Nor is there any suggestion in the record that the police attempted to cleanse the information by any subterfuge or calculation. Under these circumstances police officers should not be subject to tort liability because the search failed to reveal the suspected munitions cache. The constitutional requirement for obtaining search warrants through the judicial process should offer some protection to police

officers absent wrongdoing on their part in obtaining the warrant.

On remand for trial, I would limit the issue to whether the police officers reasonably believed they continued to have probable cause to search the Turngrens' house when the informant indicated it was the wrong house immediately before they entered onto the premises. The reason for proceeding with the execution of the warrant should be fully presented to a jury in connection with the issues of false arrest, false imprisonment and malicious prosecution.

The causes of action based on slander, defamation and violation of 42 U.S.C. § 1983 (1976) are not supported by the record. I would affirm the Court of Appeals on these matters.

BRACHTENBACH, CALLOW, and GOODLOE, JJ., concur with SKIMAS, J. Pro Tem.