[No. 18878-7-III.   Division Three.   February 27, 2001.]

JAMES A. STANSFIELD, *Appellant*, v. DOUGLAS COUNTY, *Respondent*.

*Robert F. Hedrick,* for appellant.

*Stanley A. Bastian* and *Robert R. Siderius, Jr.* (of *Jeffers, Danielson, Sonn & Aylward, P.S.*), for respondent.

KURTZ, C.J. — James A. Stansfield, M.D., is suing Douglas County and the State of Washington because he believes he was damaged by a wrongful prosecution for the murder of his wife and a friend. Over four years after he filed the lawsuit, he filed an amended complaint adding several new theories of liability. On summary judgment, the superior court concluded that the new claims were time-barred because the claims did not relate back under CR 15(c). The court reasoned that the decision to wait to bring the new claims was the result of a deliberate strategy and, for that reason, the commencement of those causes of action would not relate back to the date of the filing of the original lawsuit. Additionally, the court dismissed the defamation claim, concluding that Dr. Stansfield had failed to produce sufficient evidence to support the claim. We decide that the test under CR 15(c) for claim amendment had been met and that the amended claims related back. We conclude that they should not have been dismissed as untimely. We

further decide that Dr. Stansfield failed to raise a genuine issue of material fact regarding the superior court's summary judgment dismissal of his defamation claim.

## FACTS

James A. Stansfield, M.D., was charged by information in Douglas County with two counts of first degree murder. Deputy Prosecutor Frank Jenny filed a Motion and Affidavit for Order of Probable Cause, Issuance of Warrant and Fixing Bail. Subsequently, Douglas County Superior Court Judge Carol A. Wardell signed an Order Determining Existence of Probable Cause and Directing Issuance of Summons.

In making his probable cause affidavit, Deputy Prosecutor Jenny relied upon information gathered during an investigation into the deaths of Patricia Stansfield, Dr. Stansfield's wife, and Fred Smith, a friend. The Douglas County Sheriff's Office conducted the investigation under the direction of Sergeant Richard Adams.

The police investigation revealed that during the early morning hours in August 1990, James Stansfield found his wife, Patricia, dead in their home. Dr. Stansfield told police that he had fallen asleep on the couch in the living room, and upon going to bed at approximately 1:30 A.M., he discovered his wife was dead. She was sitting up in the bed, with the light on while reading, and appeared to have fallen asleep. When Dr. Stansfield examined her closely, he found her pupils were dilated and she had no vital signs.

Dr. Robert Bonifaci, Deputy Coroner for Douglas County, performed an autopsy on Mrs. Stansfield. He determined that she had died of postural asphyxiation. Dr. Bonifaci concluded that the asphyxiation was induced by a combination of ingestion of alcohol and her posture of her head lying on her chest. Her death was determined to be spontaneous or natural.

A little over five months later, Fred Smith was found dead in his car. Mr. Smith initially appeared to have been in a

one-car accident. Sergeant Adams investigated the death. Following an investigation and an autopsy performed by Dr. Bonifaci, it was determined that Mr. Smith had not died as a result of the car accident. Rather, it appeared Mr. Smith died from repeated blows with a blunt instrument to the back of his head.

During the course of Sergeant Adams's investigation, two women told him that Dr. Stansfield and Fred Smith's wife, Susan Smith, were having an affair. Sergeant Adams also learned that the Smiths had recently moved away and Mr. Smith had returned to finish up some business for his employer. Sergeant Adams was told that Dr. Stansfield was concerned about the move, and specifically wanted to know if it was Mrs. Smith's idea to move. Sergeant Adams also learned that Mr. Smith had been to Dr. Stansfield's home for dinner the night before he died.

Additionally, Sergeant Adams interviewed an individual, Rodney Bonnifield, who claimed to have information about Fred Smith's death. During the interview, Mr. Bonnifield said that two people, one he later identified as Dr. Stansfield, offered to pay him to kill Fred Smith. Mr. Bonnifield passed a polygraph regarding this information.

Sergeant Adams also received a telephone call from Quincy Police Chief Merle Wilson. Chief Wilson stated that a local pharmacist, Dave Manning, had contacted him. Mr. Manning reported that a short time before Mrs. Stansfield's death, Dr. Stansfield purchased a four-ounce bottle of the liquid form of a prescription sedative known as Haldol. Dr. Stansfield told the pharmacist that the drug was to control behavior problems in his grandchildren. Mr. Manning told the police that the purchase was unusual because: (1) Haldol is generally prescribed only for psychiatric patients and was not generally used for behavior modification, especially in children; (2) nearly all Haldol prescriptions are in the pill form and the liquid form is very rarely used; and (3) Dr. Stansfield had been retired since 1985.

Sergeant Adams learned that Haldol is a colorless, taste-less liquid that would be undetectable when added to other

liquids. He further learned that doses as low as two milligrams could induce sleepiness and high doses can lead to stupor, unconsciousness, and death.

Sergeant Adams contacted Dr. Bonifaci and requested Fred Smith and Patricia Stansfield's blood be tested for the presence of the drug Haldol. Barry Logan, Ph.D., of the Washington State Toxicology Laboratory reported to Dr. Bonifaci regarding the results of the additional tests. His written report revealed that Mrs. Stansfield had a Haldol level of .05 milligrams per liter. The report stated that "[i]n this case the identity of diazepam and haloperidol [Haldol] have subsequently been confirmed in the blood by mass spectrometry." Mr. Smith's blood revealed a .11 milligram per liter concentration of Haldol. However, the report indicated that the more conclusive testing by mass spectrometry could not be run because of a lack of remaining blood samples. Dr. Logan recommended that further testing be conducted on a liver sample from Mr. Smith to confirm the presence of Haldol.

A sample of Mr. Smith's liver was sent to the Chemical Toxicology Institute located in Foster City, California. Randall Baselt, Ph.D., performed two tests on the sample. He concluded that the tests indicated a .22 milligram per kilogram Haldol concentration. In a follow-up report, Dr. Baselt was not able to analyze the sample, and thus could not provide additional information.

As a result of the blood testing, Dr. Bonifaci reviewed his previous findings on Patricia Stansfield's death. He concluded that the death by aspiration was incidental, and it was a part of the process of dying during the final moments. He concluded that Mrs. Stansfield would have died with or without the aspiration. Finally, he changed the Certificate of Death to indicate that Mrs. Stansfield died not as a result of postural aspiration, but rather as a result of homicide. He noted that Mrs. Stansfield had been given an overdose of drugs, including Haldol.

The prosecutor's office obtained medical records and prescription drug profiles for both Mrs. Stansfield and Mr.

Smith. Neither was under a prescription for Haldol. Based on the accumulated evidence, the Douglas County Prosecutor's Office concluded that probable cause existed to charge Dr. Stansfield with the two murders.

At trial, defense counsel questioned the toxicology reports. Prior to Mr. Smith's death, he was taking Cardizem, a prescription drug. The defense questioned whether Cardizem and Haldol could be confused on the chromatography tests performed by the toxicology lab. Dr. Logan and Prosecutor Jenny discussed this on two occasions prior to trial. Dr. Logan stated that the testing for Haldol would not have been affected by the presence of the noted prescription medications, including Cardizem. This was discussed a third time, the night before his testimony at trial.

As a result of the defense inquiries, additional tests by mass spectrometry were performed on Mr. Smith's tissue sample during the week of the trial. It was thought that the mass spectrometry would conclusively distinguish between Cardizem and Haldol. Based on the new tests, the presence of Haldol was confirmed in Mr. Smith, but at a lower level than reported by Dr. Logan. However, State toxicologists questioned Dr. Logan's conclusion that Haldol would not have been confused with Cardizem in the gas and liquid chromatography tests.

During trial, the defense pointed out the possibility of confusing Haldol with Cardizem with the chromatography testing. During the State's rebuttal, Dr. Logan was not available to testify. The State toxicologist who did testify agreed that the Haldol could be confused with Cardizem during these tests. When the State attempted to introduce testimony regarding the mass spectrometry tests that confirmed the presence of Haldol, the court would not allow the tests introduced into evidence because they had been conducted too late to identify them to the defense.

Also excluded at trial was the testimony of Mr. Bonnifield, the man who alleged Dr. Stansfield wanted to hire him to kill Mr. Smith. The court ruled his testimony inadmissible because he was intoxicated at the time of his

conversation with Dr. Stansfield.

Based on the court's exclusion of the late mass spectrometry tests that confirmed the presence of Haldol and faced with a State toxicologist who would testify that the other tests would confuse Haldol with Cardizem, Prosecutor Jenny believed the State would not be able to meet its burden and moved to dismiss the case. Dr. Stansfield filed suit against Douglas County and the State.

*Procedural History.* The procedural history of this case is complicated and confusing. The record is incomplete. Dr. Stansfield initially filed a complaint in federal court, alleging a civil rights claim under 42 U.S.C. § 1983, false arrest, malicious prosecution, intentional infliction of emotional distress, negligent training and supervision, false imprisonment, and defamation. At some point, the federal court dismissed all of Dr. Stansfield's state-based causes of action without prejudice.

While his federal case was pending, Dr. Stansfield had filed a second case in Douglas County, alleging negligent investigation and the tort of outrage. More than four years after he filed this case, and after his state-based causes of action had been dismissed in federal court, Dr. Stansfield filed an amended complaint. The amended complaint alleged the same claims filed in the federal lawsuit—false arrest, malicious prosecution, infliction of emotional distress, and defamation.

At the time Dr. Stansfield filed his amended complaint, Douglas County had not filed any responsive pleadings to the original complaint. Consequently, under CR 15(a), Dr. Stansfield could amend his complaint as a matter of right. On the other hand, the State of Washington had filed an answer to the original complaint and, consequently, Dr. Stansfield could amend his pleading only by leave of court or by written consent of the State of Washington.

After Dr. Stansfield filed his amended complaint, he filed a motion for leave to amend. On this subject, our record begins with an order granting leave to amend, approved for

entry by the attorneys for all the parties. In the trial judge's memorandum opinion on summary judgment, he parenthetically notes that Dr. Stansfield was granted leave to amend as a matter of right based upon the absence of a responsive pleading.

Douglas County moved for summary judgment. This motion included the allegation that the amended causes of action did not relate back to the original complaint, and, therefore, were time barred. The court found that the new causes of action arose out of the same set of facts as the original complaint, and Douglas County was not prejudiced by the amended claims. However, the court then found that because the claims were not filed until late as part of a deliberate strategy or tactic, the amended claims would not relate back under CR 15(c) and, therefore, were untimely.

The court also dismissed Dr. Stansfield's defamation claim because it found that the claim lacked sufficient evidence to survive summary judgment.

Dr. Stansfield appeals.

## ANALYSIS

Did the trial court err by ruling the claims in the amended complaint are barred by the statute of limitations?[1]

■ We review a trial court's ruling on a request to amend on an abuse of discretion standard. *Herron v. Tribune Publ'g Co.*, 108 Wn.2d 162, 165, 736 P.2d 249 (1987). Similarly, "[a] determination of relation back under CR 15(c) rests within the discretion of the trial court and will

---

[1] In every reported case, the issues of whether a lawsuit could be amended under CR 15(a) and whether the additional claims related back under CR 15(c) were addressed by the court at the same time. The explanation is obvious. Why would a court allow a lawsuit to be amended to include claims that did not relate back and were barred by the applicable statute of limitations? Although we have decided this issue in the manner that it was presented to us, we find the procedural posture unusual and troubling. Because the issue was not briefed and argued, we did not address the issue of whether the order allowing the amendment under CR 15(a) precluded the argument that they did not relate back under CR 15(c).

not be disturbed on appeal absent a manifest abuse of discretion." *Foothills Dev. Co. v. Clark County Bd. of County Comm'rs*, 46 Wn. App. 369, 374, 730 P.2d 1369 (1986) (footnote omitted). A trial court abuses its discretion when "discretion is exercised on untenable grounds or for untenable reasons, considering the purposes of the trial court's discretion." *Coggle v. Snow*, 56 Wn. App. 499, 507, 784 P.2d 554 (1990).

■■ CR 15(c) governs the relation back of amendments in pleadings. It provides that claims relate back:

> Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading.

The rule provides a more stringent standard for changing a party:

> An amendment changing the party against whom a claim is asserted relates back if the foregoing provision is satisfied and, within the period provided by law for commencing the action against him, the party to be brought in by amendment (1) has received such notice of the institution of the action that he will not be prejudiced in maintaining his defense on the merits, and (2) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against him.

CR 15(c).

In this case the court found that the amended claims brought by Dr. Stansfield arose out of the initial set of facts alleged. That is, the new claims for false arrest, malicious prosecution, infliction of emotional distress, and defamation arose out of the original alleged facts that Dr. Stansfield was investigated, charged, and tried for murder due to the tortious conduct of the State and the County. The court additionally found that the County could not show prejudice as a result of the delay in amending the claims because they were on notice of the allegations. Thus, the court found that CR 15(c) would normally apply.

However, the court then analyzed whether the delay in amending the claims was the result of a deliberate, strategic decision. The court noted that these very claims had been alleged in the federal court case, which was filed well before the present state court case. The court found that Dr. Stansfield deliberately chose to delay amending the complaint, as in *Veradale Valley Citizens' Planning Committee v. Board of County Commissioners*, 22 Wn. App. 229, 588 P.2d 750 (1978). Additionally, the court relied upon *Woodcrest Investments Corp. v. Skagit County*, 39 Wn. App. 622, 694 P.2d 705 (1985), for the proposition that a defendant may assert timeliness even if the plaintiff attempts to add new theories, as opposed to new parties, if the plaintiff's delay was the result of a conscious decision. The court also cited *Public Utility District No. 1 v. Walbrook Insurance Co.*, 115 Wn.2d 339, 349, 797 P.2d 504 (1990) as additional authority. Consequently, the court found that the delay in adding the new claims was the result of a deliberate decision or strategy, and therefore not permissible under CR 15(c).

As discussed below, the court's reliance upon *Veradale* is misplaced because that case addresses the relation back of amendments to parties, not claims. Moreover, the court's reliance upon *Woodcrest* is problematic because that case applied the same analysis. *Woodcrest* relies upon authority that addresses the relation back of parties, not claims, and fails to make the necessary distinction between the two tests for relating back as between parties and claims.

In *Veradale*, we addressed the addition of parties under CR 15(c). This court ruled that the relation back doctrine was inapplicable because the appellant was "attempting to introduce and not substitute a new party to the proceedings long after the statutory time period for review ha[d] passed." *Veradale*, 22 Wn. App. at 238. Additionally, the relation back doctrine did not apply because the appellant was not misled about the identity of the proper and necessary parties to the suit. Instead, the failure to join them was the product of a deliberate strategy. Finally, the court

concluded that prejudice to the parties could not be discounted and therefore the relation back was not available. *Id.*

On the other hand, *Woodcrest* addresses the relation back of claims. In that case, property owners whose land had been rezoned sought to have the related zoning map resolution declared null and void. These property owners did not challenge the comprehensive plan governing the same property. At the end of the hearing on the matter, the court granted the property owners' motion to amend their claims to include a challenge to the comprehensive plan. On appeal, the court reversed the trial court and refused to allow the amendment. The *Woodcrest* court declared that "CR 15(c), however, does not permit relation back if the parties' delay is due to inexcusable neglect, or to a conscious decision, strategy or tactic." *Woodcrest*, 39 Wn. App. at 626 (citations omitted). The authorities cited for this proposition are *South Hollywood Hills Citizens Ass'n v. King County*, 101 Wn.2d 68, 77, 677 P.2d 114 (1984); *North Street Ass'n v. City of Olympia*, 96 Wn.2d 359, 368, 635 P.2d 721 (1981), *overruled on other grounds by Sidis v. Brodie/ Dohrmann, Inc.*, 117 Wn.2d 325, 815 P.2d 781 (1991); and *Veradale*.

One of the cases relied upon by *Woodcrest* is *South Hollywood*. *South Hollywood* involved an appeal of a subdivision plat approval and the relation back of parties. The neighbors who attempted to appeal the plat approval failed to name the new property owners of the property in question on their application for writ of review. The neighbors did not learn that the property had been sold to the new owners until after the 30-day appeal period had expired. The neighbors attempted to amend their appeal, and contended that the amendment should relate back under CR 15(c). The Supreme Court held that the delay in naming the new owners was caused by inexcusable neglect because the new owner's name was a matter of public record. *S. Hollywood*, 101 Wn.2d at 78.

The second case relied upon by *Woodcrest* is *North Street*, another case that addresses the relation back of the amend-

ment of parties. The *North Street* court adopted a test that combined the requirements of CR 15(c) with an evaluation of whether the failure to join the proper parties was due to inexcusable neglect. *S. Hollywood*, 101 Wn.2d at 77. The court analyzed CR 15(c) and held that the rule does not permit joinder if the delay is due to inexcusable neglect. *N. St.*, 96 Wn.2d at 368.

The rule makes clear that the relation back of amending parties is a more stringent standard than that of claims and, therefore, the tests are different for relating back. However, the *Woodcrest* court failed to make the distinction between amendment of claims and amendment of parties. Instead, the *Woodcrest* court applied the analysis from the party amendment cases to its claim amendment issue.

Finally, the superior court relies upon *Public Utility District No. 1* for the proposition that an amendment asserting claims that were not originally asserted as part of a strategy will not relate back under CR 15(c). In that case, the Supreme Court discussed relation back of a party, not a claim. It stated: "Finally, joinder under CR 15(c) will not be permitted where the plaintiff's delay is due to inexcusable neglect, a conscious decision, strategy or tactic." *Pub. Util. Dist. No. 1*, 115 Wn.2d at 349. The court then discusses how early the plaintiffs knew the identity of the proper party and the actions the plaintiffs took instead of moving to amend at that time. The Supreme Court's reliance on *Woodcrest* is unfortunate. However, its minimal reliance— using a single quote—should not be interpreted as giving *Woodcrest* the imprimatur of correctness. When *Woodcrest* and its authorities are closely examined, along with CR 15(c), we conclude it is incorrectly decided.

Here, the superior court concluded that the amended claims arose out of the same conduct alleged in the original complaint and further concluded that the amendment of the complaint to include the additional claims did not prejudice Douglas County. The test under CR 15(c) for claim amendment has been met and the amended claims relate back. The superior court's decision to allow the amend-

ments was within its discretion. We reverse the superior court's ruling that the amendments did not relate back to the date of the original complaint because the superior court misapprehended the case law and abused its discretion.

Did the court err by dismissing the defamation claim on summary judgment because material issues of fact exist?

Dr. Stansfield contends that the court erred by dismissing the defamation claim due to insufficient evidence to support the theory.

██ ██ This court reviews an order granting summary judgment de novo. The court engages in the same inquiry as the trial court—is there a genuine issue as to any material fact and is the moving party entitled to judgment as a matter of law? The court considers the evidence and the reasonable inferences therefrom in a light most favorable to the nonmoving party. *Folsom v. Burger King*, 135 Wn.2d 658, 663, 958 P.2d 301 (1998). A party is entitled to summary judgment if the party can show that there is an absence of evidence supporting the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); *Young v. Key Pharms., Inc.*, 112 Wn.2d 216, 225-26, 770 P.2d 182 (1989).

██ To recover on a defamation claim, Dr. Stansfield must prove: (1) falsity; (2) unprivileged communication; (3) fault; and (4) damages. *Mark v. Seattle Times*, 96 Wn.2d 473, 486, 635 P.2d 1081 (1981). "The degree of fault necessary to make out a prima facie case of defamation depends on whether the plaintiff is a private individual or a public figure or public official. If the plaintiff is a private individual, a negligence standard of fault applies." *Bender v. City of Seattle*, 99 Wn.2d 582, 599, 664 P.2d 492 (1983).

██ The police enjoy a qualified privilege in releasing information to the press and public in the course of a criminal investigation. *Id.* at 601. Proof of the abuse of a qualified privilege must be established by clear and convincing evidence, not simply by a preponderance of the

evidence. *Id.* Additionally, proof of knowledge or reckless disregard for the falsity of the statement is necessary to establish abuse of a qualified privilege. *Id.*

■ ■ Dr. Stansfield claims that the facts of this case reflect knowledge of falsity or recklessness as to the truthfulness of many material facts relied upon in charging him. The County responds that the defamation claim must fail if probable cause existed. However, the lack of probable cause is not an element of defamation, nor does probable cause establish a complete defense. *Fondren v. Klickitat County*, 79 Wn. App. 850, 862, 905 P.2d 928 (1995). In order to defeat a motion for summary judgment based upon a qualified privilege, the party prosecuting an action for defamation must meet "the limited burden of presenting specific facts creating a genuine issue as to the question of whether the defendant's statements were made after a fair and impartial investigation or upon reasonable grounds for belief in their truth." *Turngren v. King County*, 104 Wn.2d 293, 310, 705 P.2d 258 (1985).

First, the defamation claim is problematic because Dr. Stansfield does not provide the court with any alleged defamatory statements or press releases attributable to the County. Rather, it appears his argument is that because he was charged with the murders, the story became public and the media published the allegations. As such, he takes issue with the fact that he was charged with the murders, and the charging itself is the basis of his defamation claim.

Specifically, Dr. Stansfield charges that the County acted with knowledge of the falsity, or with reckless disregard for the truth because no affair existed between Dr. Stansfield and Susan Smith; Mrs. Stansfield was self-medicating with Haldol; Rod Bonnifield was not credible; and samples from Fred Smith's blood still existed, despite claims to the contrary. These allegations are not the type of facts that will create a genuine issue as to whether the police statements to the media were made after a fair and impartial investigation. Rather, these allegations simply reflect Dr. Stansfield's version of the facts.

The affidavit supporting the motion for probable cause and warrant recounts a lengthy and detailed investigation. To the extent possible, it appears the investigation checked each source for the accuracy of the information. For example, one witness informed the officer that Susan Smith admitted she had an affair with Dr. Stansfield. The witness claimed that Mrs. Smith telephoned her twice from Florida, and the first call was brief and the second call was longer. The officer confirmed the two phone calls of different duration placed from the Florida location to the witness through telephone records.

As such, Dr. Stansfield has not met his burden that the affidavit and motion for probable cause and warrant were not made upon reasonable grounds for belief in their truth. The investigating officer obtained information from many sources including witnesses, neighbors, friends, telephone records, and medical experts regarding the facts surrounding the case. Dr. Stansfield fails to raise a genuine issue of material fact that the investigation supporting charging him with these crimes was impartial or unfair. As a result, the trial court's dismissal of the defamation claim should be affirmed.

SWEENEY and KATO, JJ., concur.

Review granted at 145 Wn.2d 1007 (2001).