IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 39668-1-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| MARVIN LOVE TATE, JR., | ) | |
| | ) | |
| Appellant. | ) | |

JOHNSON, J.P.T.[†] — Marvin Love Tate Jr. was convicted by a jury of first degree

unlawful possession of a firearm, use of drug paraphernalia, and fourth degree assault

with domestic violence against an intimate partner. Mr. Tate appeals, making the

following claims of error: (1) his conviction for use of drug paraphernalia should be

reversed because the charge was brought outside the one-year statute of limitations,

(2) a photograph containing a red stain was admitted into evidence in error, (3) the State's

witnesses repeatedly offered impermissible opinion testimony, (4) the prosecution

conducted misconduct by eliciting impermissible opinion testimony, expressing personal

beliefs on witness credibility during closing argument, and impugning defense counsel

during rebuttal closing argument, (5) ineffective assistance of counsel, (6) cumulative

[†] Brandon L. Johnson, an active judge of a court of general jurisdiction, is serving
as a judge pro tempore of this court pursuant to RCW 2.06.150(1).

error, and (7) the crime victim penalty assessment (VPA) should be removed from the

judgment and sentence. The State disagrees with Mr. Tate on the first six assignments

of error, but concedes the $500 VPA should be struck based on recent statutory changes.

We reverse and remand because (1) the use of drug paraphernalia charge was time

barred and broadened the original count of unlawful possession of a controlled substance,

and (2) impermissible opinion testimony, constituting manifest constitutional error, was

presented that may have introduced implicit racial bias to the jury. To assist the trial court

on remand, we address the evidentiary issue. While we accept the State's concession to

strike the VPA, no further action is necessary on that obligation as Mr. Tate's judgment

and sentence is reversed in its entirety. We decline to address Mr. Tate's claims of

prosecutorial misconduct, ineffective assistance of counsel, and cumulative error as

unnecessary to resolving the appeal.

FACTS

On May 30, 2019, Marvin Love Tate Jr. was charged with first degree unlawful

possession of a firearm (UPF), unlawful possession of a controlled substance, and third

degree assault of a law enforcement officer. On May 5, 2021, the charges were amended

to add fourth degree assault with domestic violence against an intimate partner and use of

drug paraphernalia, and to remove the charge of unlawful possession of a controlled

substance.[1]

On January 9, 2023, a jury found Mr. Tate guilty of UPF, use of drug paraphernalia, and fourth degree assault with domestic violence against an intimate partner. Mr. Tate was found not guilty of third degree assault of a law enforcement officer.

*Background*

In the early morning hours of May 26, 2019, law enforcement responded to a report of a large fight, involving 30 to 50 people, at the Towne Crier, a business in Richland, Washington.[2] When officers arrived, no one was actively fighting but the officers remained on scene to deter the crowd from fighting and to keep the peace. Several officers noticed a "heated argument" between two individuals exiting the establishment who were both "yelling at each other." 1 Rep. of Proc. (RP) (Jan. 4, 2023) at 415; *see also* 2 RP (Jan. 5, 2023) at 551; 2 RP (Jan. 6, 2023) at 735. One officer believed that "an assault might occur between the parties" and approached them to "break up [the] argument." 1 RP (Jan. 4, 2023) at 416. The two individuals who were

---

[1] On February 21, 2021, our Supreme Court, in *State v. Blake*, 197 Wn.2d 170, 481 P.3d 521 (2021), voided the statute criminalizing simple possession of a controlled substance on the basis that it violated constitutional due process.

[2] This was the second response of officers that night to a disturbance at the Towne Crier.

arguing were later identified as Marvin Love Tate Jr. and Kathy Larson.[3] Mr. Tate is

a Black man and Ms. Larson is a White woman. The issue of a race was prevalent

throughout the underlying trial and remains so on review.

As one of the officers approached to break up the argument, he saw Mr. Tate point

two fingers at Ms. Larson and the officer believed he heard Mr. Tate say, "'I should put

a gun to your head and basically end it.'" 1 RP (Jan. 4, 2023) at 416. The officer asked

Ms. Larson if he heard the statement correctly, to which she replied something along the

lines of "'everything's gonna be okay'" and "'[i]t's fine.'" *Id*. at 417. At the same time

the officer was speaking to Ms. Larson, Mr. Tate was "very highly agitated," had "balled

up his fists," and then took steps toward the officer while "yelling, screaming, swearing,"

and calling him "all sorts of names." *Id.* The officer then left because he had not

witnessed a crime and there was no physical altercation, but first "advised Ms. Larson

that if she left with Mr. Tate, that [the officer] believed she would be assaulted by him."

*Id.* At this point, Ms. Larson was neither disheveled nor exhibiting any signs that a

physical altercation had occurred. Similarly, Mr. Tate did not show any signs of injury

or that he had been involved in a physical altercation. Mr. Tate and Ms. Larson entered

---

[3] Kathy Larson's last name appears in the report of proceedings only as "Larson," but in the clerk's papers as both "Larson" and "Larsen." We use "Larson" consistent with the trial proceedings.

a black Chrysler 300 sedan and left the Towne Crier together. One of Mr. Tate's friends was driving the vehicle. Mr. Tate was seated in the front passenger seat and Ms. Larson in the rear passenger seat.

A few minutes later, dispatch reported an incident involving a black Chrysler 300 at a convenience store across the street from the Towne Crier. A witness, Robert Fleming, called 911 to report a possible assault after a man got out of the front passenger seat of the vehicle and leaned through the rear passenger-side window while screaming and throwing punches at someone. The witness advised dispatch that he could also hear a female screaming from the backseat of the vehicle. By the time officers arrived at the convenience store, the vehicle was no longer there.

A short time later, an officer spotted the vehicle and performed a traffic stop. Backup officers arrived and recognized the vehicle as the one they just saw at the Towne Crier. Mr. Tate was in the front passenger seat, while Ms. Larson was in the rear passenger seat, the same seats they occupied when they left the Towne Crier. Officers noticed that Ms. Larson had red marks on her neck and chest area and her shirt was stretched out and pulled over her shoulder, partially exposing her breast, which was not consistent with her appearance minutes prior at the Towne Crier. An officer would later testify that it was "obvious from appearance and the injuries on [Ms. Larson] that something did take place." 2 RP (Jan. 6, 2023) at 758. The officers also noticed that

Mr. Tate had blood on his fingers or knuckles, which was not consistent with his

appearance at the Towne Crier. An officer also noticed what appeared to be a blood

smear across the rear passenger seat of the vehicle.

Officers attempted to detain Mr. Tate and a "fight started" when Mr. Tate

allegedly elbowed an officer in the chest. 2 RP (Jan. 5, 2023) at 566; *see also* 2 RP

(Jan. 6, 2023) at 760. An officer used his knees to take Mr. Tate to the ground in an effort

to gain control of him and, after a struggle, an officer deployed a taser on Mr. Tate.

Mr. Tate was arrested and searched incident to his arrest. From Mr. Tate's pockets,

officers obtained three straws containing white residue. The officers also observed a

white substance going down the outside of the passenger door of the vehicle, but it was

wet due to rainy conditions.

After Mr. Tate's arrest, the vehicle was impounded by law enforcement. During a

search of the vehicle, officers seized a firearm located in a backpack on the backseat of

the vehicle. Several belongings, such as mail in the backpack, indicated that the backpack

belonged to Mr. Tate.

Mr. Tate was charged and subsequently exercised his right to a jury trial.

*Objection to use of drug paraphernalia charge*

On the first day of trial, prior to jury selection, defense counsel orally objected to

the State proceeding to trial on the use of drug paraphernalia charge. Counsel argued that

because the Supreme Court, in *State v. Blake*, 197 Wn.2d 170, 481 P.3d 521 (2021), made all drug possession offenses illegal, the State should not be allowed to proceed on the use of drug paraphernalia count. The State responded that (1) *Blake* had no impact on the use of drug paraphernalia statute, (2) the State had every right to amend the charges, and (3) Mr. Tate failed to object at the time the State amended the information to remove the unlawful possession of a controlled substance charge and add the use of drug paraphernalia count. The trial court concluded that, despite the ruling in *Blake*, the use of drug paraphernalia statute was not affected by the Supreme Court's holding regarding unlawful possession of a controlled substance. The court considered defense counsel's objection as an oral motion to strike the charge and denied it.[4]

*Trial testimony*

At trial, and relevant to this appeal, the State introduced evidence from a forensic scientist, two lay witnesses, and several police officers who responded to the Towne Crier and the subsequent traffic stop.

Mr. Tate presented testimony from Robert Andrews, the driver of Mr. Tate's vehicle. Kathy Larson was hospitalized at the time of trial. With Ms. Larson's ability to

---

[4] The disagreement at this point was limited to whether *Blake* also applied to use of drug paraphernalia, thus also making that statute unconstitutional. A statute of limitations argument was not made during this objection.

attend trial in doubt, the parties waived the right to present her live testimony and entered

into a stipulation limited to what her anticipated testimony would be. The parties did not

stipulate to the accuracy or truthfulness of the anticipated testimony.

>        *State's testimonial evidence*

Jason Trigg, a forensic scientist with the Washington State Patrol Crime

Laboratory, testified that he tested the white powder from the straws that were found

on Mr. Tate, and confirmed that the powder substance was cocaine.

Robert Fleming testified as to what he witnessed in the convenience store parking

lot. The prosecutor asked Mr. Fleming if an incident occurred on May 26, 2019, that

caused him to call 911, and he replied, "Yes, ma'am. I witnessed an assault take place."

1 RP (Jan. 4, 2023) at 280. Mr. Fleming testified that he saw a male, who he later

identified as Mr. Tate, "[r]eachin' back into the passenger rear window, puttin' his hands

on a female." *Id.* at 281. When asked if anything about Mr. Tate's demeanor that night

stood out, Mr. Fleming replied, "He had an intent to hurt her." *Id.* at 299. On direct and

cross-examination, the prosecutor, defense counsel, and Mr. Fleming all used the term

"assault" when referring to the incident that Mr. Fleming witnessed. 1 RP (Jan. 4, 2023)

at 280-81, 283-86, 294, 298, 312 (direct and redirect); *Id*. at 302, 304, 307 (cross-

examination).

Mr. Fleming testified on direct examination:

Q. And how do you know that an assault occurred, that he was hitting somebody?

A. By the screams after every swing he threw at her.

Q. And screams by who?

A. By a female.

Q. By a female?

A. Yeah.

Q. How many times do you think that you observed Mr. Tate hit the female?

A. Gosh, I'd say about three or four, to my knowledge.

*Id.* at 285-86.

Mr. Fleming testified on cross-examination:

Q. Okay. You could not actually see into the backseat though, could you?

A. No.

Q. And you never saw the female, correct?

A. I saw her hand.

Q. You saw a hand?

A. Yep.

Q. Okay. You never saw her face?

A. No.

Q. You never saw her feet?

A. Nope.

Q. You never saw her kicking?

A. No.

. . . .

Q. Okay. So, as you're there about where you are now, if I was in the car right now and I was reaching into the car right now, I'd be leaning forward like this (indicating).

You couldn't see me below or anything that my hands were doing in the car; is that a fair statement?

A. I'd be able to see your elbow in the—

Q. See her elbow?

A. Your elbow. The person who was assaulting.

9

Q. You might be able to see—okay.
A. Uh-huh.
Q. From my elbows down—from my elbows up?
A. Yes.
. . . .
Q. Okay. Did you make out any of the language that was being said when she was screaming?
A. "Just stop. Just stop," and screams.
Q. Okay. Was that the actual thing she said?
A. That's what I heard.
Q. Wasn't anything else?
A. Nope. Just screaming.

*Id.* at 303-04.

Gladys Rafaela, who was with Mr. Fleming at the convenience store, testified that "first [she] heard a woman in distress" and screaming, then observed a male, who she later identified as Mr. Tate, "reaching into the backseat of the passenger side (indicating) and kind of giving a physical motion almost in the vehicle" that alarmed her. *Id.* at 318. When the State asked what physical motion occurred, Ms. Rafaela replied, "It was basically an assault. Someone physically trying to reach into [the vehicle] and hurt someone." *Id.* at 318-19.

Ms. Rafaela testified on direct examination:

Q. Okay. So, you saw the male basically climbing into the window, punching his arm (indicating)?
A. (Indicating.)
Q. Were you able to see the female?
A. No, I didn't see the female.
Q. Did you observe anything about the female?

10

A. No, I did not.
Q. Did you hear anything?
A. I heard the screaming of a female. A high-pitched yell.
Q. A high-pitched yell?
A. Uh-huh.
Q. Does it sound like—what was your impression of that?
A. Distress.
. . . .
Q. When you saw the male, what was his demeanor?
A. Upset. I could tell—maybe my assumption—something had happened, and he was not happy and she was getting the brunt of it, I guess.

*Id.* at 320-21.

Detective Dean Murstig of the Richland Police Department testified that he made the traffic stop on Mr. Tate's vehicle after dispatch reported the 911 call from the convenience store parking lot. He testified that when Kathy Larson exited the vehicle after the traffic stop "[h]er clothing was partially off her shoulder (indicating) like it had been pulled off (indicating), and then part of her breast was exposed (indicating)." *Id.* at 351. He testified that Ms. Larson was not cooperative with the investigation. Furthermore, Detective Murstig photographed Ms. Larson to document the marks that he observed on her chest. The trial court admitted the photos into evidence. Finally, Detective Murstig also testified that he noticed fresh blood on Mr. Tate's knuckles on both hands.

Sergeant Todd Sharpe of the Richland Police Department testified he encountered Mr. Tate and Ms. Larson at both the Towne Crier and the subsequent traffic stop. At the

11

Towne Crier, he saw Mr. Tate point two fingers toward Ms. Larson while appearing to

say, "'I should put a gun to your head and basically end it.'" *Id.* at 416. Additionally,

Sergeant Sharpe testified that Ms. Larson was not disheveled, and that he warned her

if she left the Towne Crier with Mr. Tate he would assault her. Sergeant Sharpe further

testified that less than 10 minutes later, after the traffic stop, he noticed "red marks at the

lower part of [Ms. Larson's] neck, and her shirt seemed to be stretched out and pulled

over kind of one shoulder." *Id.* at 421-22. Sergeant Sharpe testified that, at some point

during the traffic stop, he contacted Mr. Fleming to verify what he had witnessed that

precipitated his call to 911. After speaking with Mr. Fleming, Sergeant Sharpe came to

the conclusion that he had probable cause to arrest Mr. Tate for assault of Ms. Larson.

Furthermore, Sergeant Sharpe testified that, while trying to detain Mr. Tate, he witnessed

Mr. Tate swing his left elbow into Officer James George's chest. After Mr. Tate was in

handcuffs, Sergeant Sharpe testified that a blue straw cut up into three pieces, with white

powder inside, was located on Mr. Tate.

On redirect, Sergeant Sharpe testified as follows regarding probable cause:

> Q. And so when the vehicle—when the black Chrysler was pulled
> over, was there reasonable suspicion?
> A. There was, yes.
> Q. For what?
> A. For assault.
> Q. And then when you arrived at the scene you went and talked to
> Officer George?

A. Yes, briefly.

Q. And then after that you talked to the reporting party, Robert Fleming?

A. Yes.

Q. And then based on that conversation, did you then have probable cause?

A. Yes, we did.

Q. What did you have probable cause for?

A. Assault. It was DV [domestic violence] assault at the time. I don't know if that's—if we knew that at the moment or not, but it was for at least assault.

Q. And you developed that probable cause after talking to the reporting party, correct?

A. Yes.

Q. And then after you talked to the reporting party is when you went and talked to Officer George that you then believed you had probable cause for assault four?

A. Yes.

2 RP (Jan. 5, 2023) at 542.

Officer James George of the Richland Police Department testified that he encountered Mr. Tate and Ms. Larson at both the Towne Crier and the subsequent traffic stop. When Officer George interacted with Ms. Larson at the Towne Crier, she "looked presentable, as anyone would be wearing their normal clothing in her situation." *Id.* at 555. However, after the traffic stop, Ms. Larson's "shirt was stretched down (indicating) and exposing one of her breasts with the bra on, and her chest and everything was all red and flushed as if something—some sort of contact was made against her—made to her." *Id.* at 561. He further noticed what appeared to be a "blood smear" on the center of the

13

rear passenger seat of the vehicle during the traffic stop. *Id.* at 570. However, Officer

George testified that he had not looked inside of the vehicle during the initial contact with

Mr. Tate and Ms. Larson at the Towne Crier.

On recross-examination, Officer George's testimony turned to his personal

integrity after questioning by defense counsel:

> Q. And do you have a duty as a police officer, an investigator of the law, to take both inculpatory and exculpatory evidence, do you not?
> A. When it's relevant, yes.
> Q. And you don't make the decision as to what evidence you're gonna collect?
> A. No. I make decisions on what we collect based on my knowledge of the case and what I believe is—
> Q. So, I'm gonna take these shell casings because they came out of that gun, but I'm not gonna pick up those shell casings because they may show self-defense.
> You don't get to make that decision, do you?
> A. No. If we recovered shell casings at a scene, we're collecting them all.
> Q. You don't make a decision whether you collect inculpatory or exculpatory.
> A. I guess I'm trying to decide what is your question. We don't decide exculpatory or inculpatory. We collect all evidence.
> Q. *I'm talking about your prejudice as a police officer*, you make a decision whether I'm gonna collect that or not collect that, I'm gonna record that statement or not record that statement?
> A. If you're implying that there's any ill will goin' in my investigation or if I have any particular prejudices towards [Mr. Tate], you're absolutely wrong. I do not—that narrative has been worn out over the past couple years, and frankly I'm sick and tired of it.
> I know who I am. I know my integrity. I know why I'm in this job. I know I'm not a liar. I'm not a racist. *Even though I get told that way too*

*often by people like Mr. Tate, that is not—that isn't what it is. It's a worn-out record at this point*, and I'm not gonna stand [] for it here either.

*Id.* at 688-89 (emphasis added).

Officer George testified on cross-examination regarding evidence procedures

concerning Mr. Tate's vehicle:

> Q. Did you follow the tow truck to the impound yard?
> A. May I refer back to my report, please?
> Q. If it helps.
> A. Sergeant Jansen followed the vehicle from the stop location to RPD [Richland Police Department].
> Q. So, you didn't follow it?
> A. No, I did not follow it.
> Q. So, you also are not the one who placed the evidence tapes on the vehicle?
> A. No.
> Q. So, you don't know what happened to the vehicle between the time it was—well, the time you took Mr. Tate away until you saw it the next day at 2:00 a.m.?
> A. That's not correct. I do know what happened because my partners have documented that and report what we do. We hold our integrity to the highest degree (indicating). Especially [in] this day and age in law enforcement, and *those are the people that I trust and what is written in the reports is factual*.

*Id.* at 634-35 (emphasis added).

Lieutenant David Jansen of the Richland Police Department testified he

encountered Mr. Tate and Ms. Larson at both the Towne Crier and the subsequent traffic

stop. He testified that while at the Towne Crier he heard Mr. Tate say the word "'gun'"

and "'head,'" which caught his attention. 2 RP (Jan. 6, 2023) at 737. He further testified

that Ms. Larson had no apparent redness or physical injuries during the encounter at the Towne Crier. However, when the vehicle was stopped a short time later, Ms. Larson's shirt was partially down, exposing one of her breasts, and that there were "red marks on her chest and neck area." *Id.* at 755-56. During the traffic stop, Ms. Larson denied multiple times that she had been assaulted by Mr. Tate. Despite her denial, Lieutenant Jansen and the other officers determined there was probable cause to arrest Mr. Tate for domestic violence assault of Ms. Larson.

On redirect, Lieutenant Jansen testified as to why he believed Ms. Larson denied that an assault occurred:

> Q. Lieutenant Jansen, when you contacted Kathy at the traffic stop, she denied multiple times that she was assaulted by [Mr. Tate]; is that right?
> A. That's correct.
> Q. But there was probable cause determined, and [Mr. Tate] was arrested, right?
> A. That's correct.
> Q. For what charge?
> A. Our initial reason for arresting him was for domestic violence assault.
> Q. Against Kathy?
> A. Against Kathy, that's correct.
> Q. But she denied it. Why do you arrest for it?
> A. It's not unheard of for domestic violence victims to not want to get their partner in trouble. *It's pretty frequent that we don't receive the full truth from them* or what's even more often is they'll tell what happened the night of so that the situation stops, and then they'll recant and give us a different story later.

So, this was nothing new that we hadn't—haven't heard of, hadn't dealt with before, hadn't been trained on. *So in this case, it was very clear that an assault had taken place she had the injuries of red marks by her chest.* Her clothes had been pulled down. There was blood in the backseat. Officers referred to that they'd seen blood on Mr. Tate's hand.

So, all of that probably would have been enough that we could have made the arrest based on all those different circumstances, but then we have an independent person who's calling in that they witnessed this assault. So even if she's denying it and, you know, I guess wants to get assaulted, we're gonna need to step in. We're required to. We have to.

It's like state law requires us, but we also want to step in and try to ensure that this situation is under control. That maybe help can be obtained for anybody that needs it to—to stop this from continuing.

Q. Even if she doesn't want to be a victim?

A. Absolutely.

*Id.* at 855-57 (emphasis added).

*Defense's testimonial evidence*

Due to health issues, Kathy Larson was unavailable to testify during trial. The parties stipulated to Ms. Larson's anticipated testimony and the trial court read the entire stipulation to the jury, including the fact that the parties did not stipulate to the accuracy or truthfulness of the anticipated testimony. Part of the anticipated testimony was that Ms. Larson was flailing and kicking from the back seat, kicked at Mr. Tate, and that Mr. Tate grabbed her legs but did not assault her.

Robert Andrews testified that he was at the Towne Crier with Marvin Tate and Kathy Larson. According to Mr. Andrews, he arrived at the Towne Crier separately from Mr. Tate and Ms. Larson, but at some point obtained the keys to Mr. Tate's vehicle

17

and drove all three of them from the Towne Crier. Prior to departing, Mr. Andrews

grabbed a small bag containing a firearm from another friend's vehicle and placed it

inside the backpack in the backseat of Mr. Tate's vehicle. Mr. Andrews claimed the small

bag and firearm both belonged to him. He also testified that Ms. Larson was intoxicated,

was kicking the front seat of the vehicle from the back seat while stopped at the

convenience store, and that no assault occurred.

*Photographic exhibit of the interior of Mr. Tate's vehicle*

Defense counsel objected to the State's introduction of a photograph, exhibit 46,[5]

that showed a red substance on the backseat of Mr. Tate's vehicle, claiming the

photograph was more prejudicial than probative and should be excluded. The trial court

overruled the objection and the photograph was admitted after the following sidebar:

> [DEFENSE COUNSEL]: Looking at photograph 46, there's no
> indication or any testimony that Ms. Tate[6] was bleeding in any way,
> shape, or form. This is somebody seriously bleeding somewhere. I—I don't
> know how it got there. It's highly prejudicial. It tends to impassion and
> inflame people when they see blood. Especially when we're talkin' about
> assault cases.

---

[5] As discussed later, the photograph defense counsel was objecting to during trial
was actually exhibit 45, but the objection was attributed to exhibit 46. Once this became
apparent during our review of the case, Mr. Tate supplemented the record on review with
exhibit 45, which the parties agree is the photo that shows a red substance on the backseat
of the vehicle. Exhibit 46 is a photograph of the center console of the vehicle.  Initially,
only exhibits 3, 4, and 46 were designated for review.

[6] It is not clear if defense counsel was referring to Mr. Tate or Ms. Larson because
there is no "Ms. Tate."

I would [argue] it's more prejudicial than probative and move to exclude Number 46.

THE COURT: I will wait until there's a foundation. My recollection was, was that the officer had testified or Sharpe had testified—I'm not sure if it was this officer—that they had seen into the car, had a good look and didn't notice this in the car before the stop and when they were talking at the [Towne Crier].

Based on that, I would find it is probative.

If it was just a stain in the car with nothing more I would tend to agree with you, but if it's a stain in the car they said—the officer said they didn't notice before, and then at the [Towne Crier] he—

[DEFENSE COUNSEL]: I ask foundation we be able to identify. That's it is not even in some area that would be seen just simply looking in the car, your Honor.

THE COURT: That's subject for cross, but now we're talking about probative value or whether or not there's a weakness or issue to be argued.

[DEFENSE COUNSEL]: But we're also talking about prejudice and whether it's more prejudicial than probative. If I've got a bunch of these of my brother (indicating) you never could have seen because he was out butchering this weekend and they're cow parts, and you don't know they're cow parts, it's gonna prejudice a jury and why are we getting into 'em?

THE COURT: No, I understand. My ruling would be what would appear to be blood indicative of an assault would be something that would be of probative value more than prejudicial effect. It is prejudicial, but the probative value would outweigh it to the extent that it could be shown that the—that the stain or whatever you want to call it did not appear to be there by the officers when they had a chance to see the car earlier.

So, I would overrule the objection.

2 RP (Jan. 5, 2023) at 599-600.

*Motion to dismiss use of drug paraphernalia charge*

Prior to closing argument, Mr. Tate renewed his challenge to the use of drug

paraphernalia charge, this time on the basis that it was filed after expiration of the statute

of limitations. The trial court denied the motion stating the "amended charge is allowable because it does relate back to the original charge which was filed within the time period in the statute." 2 RP (Jan. 9, 2023) at 982; *see also id*. at 988-89.

### *Jury instructions*

Regarding the credibility of the witnesses and remarks made by counsel, the trial court orally stated the following to the jury:

> You are [] the sole judges of the credibility of each witness. You are also the sole judges of the value or weight to be given to the testimony of each witness. In assessing credibility you must avoid bias, conscious or unconscious, including bias based on religion, ethnicity, race, sexual orientation, gender or disability.
>
> In considering a witness's testimony, you may consider these things: The opportunity of the witness to observe or know the things he or she testifies about, the ability of the witness to observe accurately, the quality of a witness's memory while testifying, the manner of the witness while testifying, any personal interests that the witness might have in the outcome or the issues, any bias or prejudice that the witness may have shown, the reasonableness of the witness's statements in the context of all of the other evidence, and any other factors that affect your evaluation or belief of a witness or your evaluation of his or her testimony.
>
> The lawyers' remarks, statements, and arguments are intended to help you understand the evidence and apply the law. It is important, however, for you to remember that the lawyers' statements are not evidence. The evidence is the testimony [and] the exhibits. The law is contained in my instructions to you. You must disregard any remark, statement, or argument that is not supported by the evidence or the law in my instructions.

2 RP (Jan. 9, 2023) at 997-98; *see also* Clerk's Papers (CP) at 68.

*Verdict*

The jury found Mr. Tate guilty of UPF, use of drug paraphernalia, and fourth degree assault. He was acquitted of third degree assault.

*Sentencing*

Mr. Tate later moved on various grounds to vacate the jury's verdict on the use of drug paraphernalia. The trial court denied the motion, stating, "but certainly that'd be an issue that it sounds like will be taken up on appeal." 1 RP (Apr. 17, 2023) at 10.

Mr. Tate now appeals.

ANALYSIS

*Use of drug paraphernalia conviction*

Mr. Tate argues that his use of drug paraphernalia conviction should be reversed as he was not charged until after the one-year statute of limitations expired. The State argues that it is allowed to amend an information after the statute of limitations period has run if (1) the amendment does not broaden the original charge, and (2) the State timely filed the original charge. The State's analysis is correct, but in this case the use of drug paraphernalia charge broadened the original charge. As such, it was time barred by the statute of limitations.

"We review the decision to allow amendment of [a charging document] for abuse of discretion." *State v. Warren*, 127 Wn. App. 893, 896, 112 P.3d 1284 (2005) (citing

*Stansfield v. Douglas County*, 107 Wn. App. 20, 28, 26 P.3d 935 (2001), *aff'd*, 146

Wn.2d 116, 43 P.3d 498 (2002)). "A trial court abuses its discretion when its decision

rests on untenable grounds or reasons." *Id.* "In general, we will not find reversible error

in amendment of an information unless specific prejudice is shown." *Id.*

Under former RCW 9A.04.080(1)(k) (2017), "No misdemeanor may be

prosecuted more than one year after its commission." However, "the State can amend an

information after the limitation period has passed if the original information was timely."

*State v. Mehaffey*, 125 Wn. App. 595, 598, 105 P.3d 447 (2005) (citing *State v. Eppens*,

30 Wn. App. 119, 123, 633 P.2d 92 (1981)). An amended information relates back to the

filing date of the original information so long as the charge as amended "'arose out of the

conduct, transaction, or occurrence set forth or attempted to be set forth in the original

pleading.'" *Id.* (quoting CR 15(c)). This rule is limited, however, in that "an amendment

will be foreclosed if it operates to 'broaden or substantially amend the original charges.'"

*Warren,* 127 Wn. App. at 896 (quoting *In re Pers. Restraint of Thompson,* 141 Wn.2d

712, 729, 10 P.3d 380 (2000)).

Here, Mr. Tate was originally charged with unlawful possession of a controlled

substance on May 30, 2019. The charge was amended to use of drug paraphernalia on

May 5, 2021, more than one year after the limitation period for that crime had passed. [7]

Therefore, the ability to charge Mr. Tate with a new misdemeanor is time barred unless

the amended charge of use of drug paraphernalia arose out of the conduct, transaction, or

occurrence set forth or attempted to be set forth in the original pleading of the unlawful

possession of a controlled substance charge without broadening or substantially

amending it.

The parties briefing on appeal focuses on the Supreme Court's decision in *Blake*.

Mr. Tate claims that because the portion of the unlawful drug possession statute he was

originally charged under, former RCW 69.50.4013(1) (2003) was voided by the Supreme

Court in *Blake* on constitutional grounds, it is not a law at all and is inoperable as though

the statute had never been passed, meaning he was charged with a nonexistent crime.

Accordingly, Mr. Tate claims the amended information alleging use of drug

paraphernalia broadens the original charge and does not relate back to the timely filed

information because unlawful possession of a controlled substance did not carry any

liability and no possibility of a penalty.

The State, on the other hand, argues *Blake* did not hold that possession of a

controlled substance was a nonexistent crime. The State claims that at the time the case

---

[7] The current version of RCW 9A.04.080(1)(k), which did not go into effect until after Mr. Tate's offense conduct date, now provides for a two-year statute of limitations.

23

was filed in 2019, Mr. Tate violated an existing statute. For these reasons, the State claims the amended information adding the use of drug paraphernalia count relates back to a valid unlawful possession of a controlled substance charge in the information filed on May 30, 2019, and thus, the statute of limitations on the use of drug paraphernalia charge has not been violated because it was tolled.

We decline to address these arguments because there is a dispositive basis to reverse—the use of drug paraphernalia charge is a broadening of the original unlawful possession of a controlled substance charge.

The State articulates in its briefing to this court why it believes the original charge of possession of a controlled substance was an existent crime when it originally filed its information, but fails to analyze how the use of drug paraphernalia charge relates back. Rather, the State argues, "Because the amended information charging Use of Drug Paraphernalia relates back to the original Possession of a Controlled Substance [charge in the] information filed on May 30, 2019, the statute of limitation[s] has not been violated." Br. of Resp't at 24-25. This argument is conclusory with no analysis.

"Our courts have had few occasions to consider the standards for relation back after the statute of limitations has run." *Warren*, 127 Wn. App. at 896-97. The trial court here expressly relied on *Warren* in its decisions during and after trial that denied Mr. Tate's challenges to the use of drug paraphernalia charge and conviction. *See* 2 RP

24

(Jan. 9, 2023) at 976-86; *see also* 1 RP (Apr. 17, 2023) at 3-10. Jerry Warren was originally charged with driving while under the influence of intoxicating liquor or any drug (DUI) and the prosecution later amended the information by adding an "*alternative count of negligent driving*" after the statute of limitations had passed. *Warren*, 127 Wn. App. at 898. "[T]he State charged [Warren with DUI]. Then, after the statute of limitations had passed, the State added an alternative charge of negligent driving, arising out of the same incident. The amendment related back to the original charge and was properly permitted by the district court judge." *Id.* at 895. This court reasoned that "[t]he amendment to add the alternative, less serious offense did not place Warren in jeopardy of multiple convictions, did not rely on different evidence, and did not create a potential for a greater stigma or penalty. The amendment did not impermissibly broaden the original charge." *Id.* at 898.

To determine whether the substituted charge in this case substantially broadened the original charge, it is helpful to analyze both the original and amended information. On May 30, 2019, Mr. Tate was originally charged in count 2 of the information with the following:

> That [Marvin Love Tate Jr.], in Benton County, Washington, on or about the 26th day of May, 2019, did unlawfully possess a controlled substance, to-wit: cocaine; proscribed by RCW 69.50.4013(1), a felony.

CP at 1.

Former RCW 69.50.4013(1) stated:

It is unlawful for any person to possess a controlled substance unless the substance was obtained directly from, or pursuant to, a valid prescription or order of a practitioner while acting in the course of his or her professional practice, or except as otherwise authorized by this chapter.

In comparison, on May 05, 2021, the State amended count 2 of the information

to the following:

That . . . Marvin Love Tate Jr., in Benton County, Washington, on or about the 26th day of May, 2019, did use a straw, drug paraphernalia, to ingest cocaine, a controlled substance other than marijuana, proscribed by RCW 69.50.412(1), a misdemeanor.

CP at 13.

The trial court provided the following instructions to the jury regarding the use of

drug paraphernalia charge:

INSTRUCTION NO. 13
A person commits the crime of Use of Drug Paraphernalia when he or she uses drug paraphernalia to ingest or otherwise introduce into the human body a controlled substance.

INSTRUCTION NO. 14
To convict the defendant of the crime of Use of Drug Paraphernalia as charged in Count Two, each of the following elements of the crime must be proved beyond a reasonable doubt:
(1) That on or about May 26, 2019, the defendant used drug paraphernalia to ingest or otherwise introduce into the human body a controlled substance; to wit: Cocaine; and
(2) That this act occurred in [the] State of Washington, County of Benton.

If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.

On the other hand, if, after weighing all the evidence, you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty.

INSTRUCTION NO. 15

"Drug paraphernalia" means all equipment, products, and materials of any kind that are used, intended for use, or designed for use in ingesting or otherwise introducing into the human body a controlled substance.

"Drug paraphernalia" includes, but [is] not limited to:

- Containers and other objects used, intended for use, or designed for use in storing or concealing controlled substances;
- Objects used, intended for use, or designed for use in ingesting, inhaling, or otherwise introducing controlled substances into the human body.

CP at 81-83 (boldface omitted).

Although both the original and amended information include drug charges, they are not alternative charges. In *State v. LaPlant*, this court held that unlawful use of drug paraphernalia is not a lesser included offense of unlawful possession of a controlled substance, explaining that:

The crime of unlawful possession of a controlled substance requires proof of two elements: (1) possession of (2) a controlled substance. [former] RCW 69.50.4013(1). The crime of unlawful use of drug paraphernalia requires proof of three elements: (1) use (2) of drug paraphernalia (3) to ". . . ingest . . . or otherwise introduce into the human body a controlled substance." [former] RCW 69.50.412(1) [(1981)]. "Drug paraphernalia" means:

27

> all equipment, products, and materials of any kind which are used, intended for use, or designed for use in planting, propagating, cultivating, growing, harvesting, manufacturing, compounding, converting, producing, processing, preparing, testing, analyzing, packaging, repackaging, storing, containing, concealing, injecting, ingesting, inhaling, or otherwise introducing into the human body a controlled substance.

[Former] RCW 69.50.102[(a) (1981)].

> The elements of unlawful use of drug paraphernalia are not necessary elements of unlawful possession of a controlled substance. A defendant can possess a controlled substance without using drug paraphernalia. Moreover, proof that a defendant used drug paraphernalia requires proof of an element not found in the crime of possession, i.e., that the defendant used the drug paraphernalia in a proscribed manner.

157 Wn. App. 685, 687-88, 239 P.3d 366 (2010); *see also State v. Neeley*, 113 Wn. App. 100, 107, 52 P.3d 539 (2002) ("The trial court correctly concluded possession of drug paraphernalia alone does not give probable cause to arrest for possession of such items— bare possession of drug paraphernalia is not a crime."); 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTION: CRIMINAL (WPIC) 50.31, at 1253 (5th ed. 2021) ("Use versus possession. Possession of drug paraphernalia by itself is not a crime under state law; *the crime requires an improper use*.") (emphasis added) (boldface omitted); WPIC 50.03, at 1217 (5th ed. 2021) ("Lesser included offenses. *Possession*

*of drug paraphernalia is not a lesser included offense of possession of controlled substances*.") (emphasis added) (boldface omitted). [8]

*Warren* is distinguishable because the State's amendment here to include a charge for the use of drug paraphernalia is not an alternative, lesser offense, to unlawful possession of a controlled substance. Accordingly, the trial court abused its discretion by allowing the amended information to include a broadened charge. Because the charge does not relate back, it is time barred and the use of drug paraphernalia conviction is reversed with prejudice.

*Photographic exhibit*

Mr. Tate argues the trial court abused its discretion by admitting a photographic exhibit seeming to show a blood smear on the back seat of his vehicle. He asserts that the trial court's ruling was based on an erroneous belief that police officers had already seen the inside of his vehicle earlier in the evening and could testify that the stain was new. The State responds that the photograph was properly admitted regardless of any evidence

---

[8] On the other hand, an alternative charge to possession of a controlled substance is the crime of possession with the intent to deliver. *See* WPIC 50.02, at 1120 (4th ed. 2016) ("Lesser included offense. Possession of a controlled substance is generally a lesser included offense of the crime of possession with intent to deliver.") (boldface omitted); *see, e.g.*, *State v. McClam*, 69 Wn. App. 885, 850 P.2d 1377 (1993) (error to refuse to give simple possession instruction as lesser included offense when supported by affirmative evidence).

that an officer had seen inside the car earlier in the evening because the eyewitness testimony at trial was that an assault took place inside the vehicle, and any evidence of blood in the vehicle would therefore be relevant.

We review decisions excluding or admitting evidence at trial for an abuse of discretion. *See State v. Thomas*, 150 Wn.2d 821, 856, 83 P.3d 970 (2004). "'A trial court abuses its discretion when its decision is manifestly unreasonable or exercised on untenable grounds or for untenable reasons.'" *State v. Arndt*, 194 Wn.2d 784, 799, 453 P.3d 696 (2019) (quoting *State v. Lord*, 161 Wn.2d 276, 283-84, 165 P.3d 1251 (2007)). "Specifically, an abuse of discretion can be found when the trial court 'relies on unsupported facts, takes a view that no reasonable person would take, applies the wrong legal standard, or bases its ruling on an erroneous view of the law.'" *Id.* (quoting *Lord*, 161 Wn.2d at 284). "In our review for abuse of discretion, we may affirm the trial court on any basis that the record supports, including any theories 'established by the pleadings and supported by the proof,' even if these theories were not originally considered by the trial court." *Id.* (quoting *LaMon v. Butler*, 112 Wn.2d 193, 200-01, 770 P.2d 1027 (1989)).

At trial, defense counsel objected to the admission of the photograph, exhibit 46, because Mr. Tate claimed that there was no indication or any testimony that he was bleeding in any way, shape, or form, and that it was highly prejudicial to show the jury a

picture with what appeared to be a blood smear on the back seat of the vehicle.[9] The trial

court recalled that an officer had testified he was able to see into the vehicle at the Towne

Crier and did not notice any blood, but then noticed blood in the vehicle after the traffic

stop, therefore making the photograph probative. The trial court opined that if it was just

a stain in the car with nothing more, that it would agree with Mr. Tate. The court further

stated that the probative value of the photograph outweighed its prejudicial effect.

Mr. Tate is correct that the trial court's recollection was flawed. When the

photograph was admitted into evidence, Officer George had already testified that he did

not look into the vehicle when he first contacted Mr. Tate and Ms. Larson at the Towne

Crier. However, he did testify that during the later traffic stop he noticed a "blood smear"

on the center of the rear passenger seat of the vehicle. 2 RP (Jan. 5, 2023) at 570, 607.

Admission of the photograph does not, however, hinge only on the testimony of

Officer George. There was testimony from Robert Fleming and Gladys Rafaela that they

witnessed, while in the convenience store parking lot, an assault take place in the back

seat of Mr. Tate's vehicle. Any evidence of blood where an alleged assault occurred

would be relevant evidence. Further, several other officers testified that, while at the

---

[9] The parties agree that exhibit 46 was a photograph of the vehicle's center console, not the back seat, and that exhibit 45 is the photograph of the backseat with what appeared to be a blood smear. At trial, it was clear that the objection was over the exhibit showing the purported blood smear.

Towne Crier, Mr. Tate did not show any signs of injuries. However, these same officers

did notice blood on Mr. Tate's hands and knuckles after the traffic stop.

There was sufficient testimony apart from that of Officer George to make the

photograph relevant. The trial court weighed the probative value of the photograph versus

its prejudicial impact.  The court did not abuse its discretion by admitting the photograph

into evidence.

*Opinion testimony*

Mr. Tate argues that five different lay witnesses called by the State offered an

opinion on his guilt and/or the credibility of other State witnesses. He claims this

impermissible testimony constituted manifest constitutional error and, therefore, may be

challenged for the first time on appeal. RAP 2.5(a)(3). The State responds that the

testimony of these witnesses has been taken out of context, did not amount to an opinion

on Mr. Tate's guilt, and had no consequence on the jury's verdict. While the State may be

correct that these statements when analyzed individually do not demonstrate manifest

constitutional error, when viewed as a whole the potential bias was pervasive enough that

the impact on the outcome at trial cannot be viewed as harmless.

Mr. Tate brings this challenge for the first time on appeal. In general, appellate

courts will not consider issues raised for the first time on appeal. *State v. Kirkman*, 159

Wn.2d 918, 926, 155 P.3d 125 (2007) (citing RAP 2.5(a); *State v. Tolias*, 135 Wn.2d 133,

140, 954 P.2d 907 (1998); *State v. McFarland*, 127 Wn.2d 322, 332-33, 899 P.2d 1251 (1995)). However, a claim of error may be raised for the first time on appeal if it is a manifest error affecting a constitutional right. *Id.* (citing RAP 2.5(a)(3); *State v. Walsh*, 143 Wn.2d 1, 7, 17 P.3d 591 (2001); *Tolias*, 135 Wn.2d at 140).

"In analyzing the asserted constitutional interest, we do not assume the alleged error is of constitutional magnitude." *State v. O'Hara*, 167 Wn.2d 91, 98, 217 P.3d 756 (2009). "We look to the asserted claim and assess whether, if correct, it implicates a constitutional interest as compared to another form of trial error." *Id.* "After determining the error is of constitutional magnitude, the appellate court must determine whether the error was manifest." *Id.* at 99. "'Manifest' in RAP 2.5(a)(3) requires a showing of actual prejudice. To demonstrate actual prejudice, there must be a 'plausible showing by the [appellant] that the asserted error had practical and identifiable consequences in the trial of the case.'" *Id.* (alteration in original) (internal citations omitted) (quoting *Kirkman*, 159 Wn.2d at 935).

With these legal principles in mind, we now analyze Mr. Tate's claim that impermissible opinion testimony affected his constitutional right to a fair trial.

Opinion testimony can be defined as "[t]estimony based on one's belief or idea rather than on direct knowledge of the facts at issue." *State v. Demery*, 144 Wn.2d 753, 760, 30 P.3d 1278 (2001) (plurality opinion) (alteration in original). In determining

whether statements are impermissible opinion testimony, "the court will consider the circumstances of the case, including the following factors: '(1) the type of witness involved, (2) the specific nature of the testimony, (3) the nature of the charges, (4) the type of defense, and (5) the other evidence before the trier of fact.'" *State v. Montgomery*, 163 Wn.2d 577, 591, 183 P.3d 267 (2008) (internal quotation marks omitted) (quoting *Demery,* 144 Wn.2d at 759). "However, this court has held there are some areas that are clearly inappropriate for opinion testimony in criminal trials. Among these are opinions, particularly expressions of personal belief, as to the guilt of the defendant, the intent of the accused, or the veracity of witnesses." *Id.* (citing *Demery,* 144 Wn.2d at 759). Lastly, "police officers' testimony carries an 'aura of reliability.'" *Id.* at 595 (quoting *Demery*, 144 Wn.2d at 765). "But police officers' opinions on guilt have low probative value because their area of expertise is in determining when an arrest is justified, not in determining when there is guilt beyond a reasonable doubt." *Id.*

*Robert Fleming*

Mr. Tate claims that an ultimate issue in this case is whether an assault occurred at all. He claims that Robert Fleming, who called 911 from the convenience store parking lot to report an incident, provided impermissible opinion testimony that Mr. Tate (1) was guilty of assault and (2) intended to commit an assault. We conclude that, while it was

error to allow an impermissible statement from Mr. Fleming concerning Mr. Tate's intent, that error was not manifest.

First, Mr. Tate claims that Mr. Fleming "repeatedly described what he had witnessed—a Black man leaning through a car window and moving his arm—as an 'assault.'" Br. of Appellant at 32 (quoting 1 RP (Jan. 4, 2023) at 280). Mr. Tate argues that although it is framed as a direct observation, it was Mr. Fleming's opinion about what was happening inside the vehicle, an area that he could not see. Mr. Tate's characterization of this testimony is inaccurate. Mr. Fleming was asked if there was some incident that caused him to call 911. Mr. Fleming replied, "Yes, ma'am. I witnessed an assault take place." 1 RP (Jan. 4, 2023) at 280. Following that statement, Mr. Fleming testified that he saw a male, who he later identified as Mr. Tate, reaching into a vehicle's window and putting his hands on a female. This testimony was not a reference to guilt. Rather, it was an explanation as to why Mr. Fleming called 911—he witnessed a woman screaming and Mr. Tate hitting her three or four times. Mr. Fleming *did not* repeatedly describe what he had witnessed *as a Black man* leaning through a car window and moving his arm as an assault. Mr. Fleming is a lay witness. While using "assault" as the descriptive verb is far from ideal, it is not a manifest error of constitutional magnitude.

Second, Mr. Tate claims Mr. Fleming's testimony that Mr. Tate "'had an intent to hurt' Ms. Larson" was improper. Br. of Appellant at 33 (quoting 1 RP (Jan. 4, 2023) at

35

299). The State admits that this statement was an unresponsive answer to a question regarding Mr. Tate's demeanor, and amounted to speculation by Mr. Fleming of Mr. Tate's intent. We accept the State's concession that this portion of Mr. Fleming's testimony was inappropriate and objectionable. Whether this statement, alone, constitutes actual prejudice that had practical and identifiable consequences at trial, thus making the error manifest, is not the issue. The issue is whether this testimony, in conjunction with other alleged errors, is a manifest error of constitutional magnitude.

### Gladys Rafaela

Mr. Tate claims that Gladys Rafaela provided impermissible opinion testimony indicating Mr. Tate was guilty of assault, and that she also offered an improper opinion on Mr. Tate's intent to commit an assault. First, Mr. Tate claims that Ms. Rafaela "described the incident as 'basically an assault,'" but also mentioned that she "'didn't know how to perceive the situation,'" which indicated her opinion that Mr. Tate was guilty of assault. Br. of Appellant at 32 (quoting 1 RP (Jan. 4, 2023) at 319, 332). Second, Mr. Tate claims that Ms. Rafaela testified as to her opinion regarding Mr. Tate's intent when she stated that she saw "Mr. Tate 'trying to reach into [the backseat window] and hurt someone.'" Br. of Appellant at 33 (quoting 1 RP (Jan. 4, 2023) at 319).

Ms. Rafaela testified that she heard a woman from inside the vehicle screaming in distress, and at the same time observed a male reaching into the backseat of the same

vehicle engaging in a physical motion, which alarmed her. The prosecution asked

Ms. Rafaela what physical motion occurred, and Ms. Rafaela replied, "It was basically

an assault. Someone physically trying to reach into [the vehicle] and hurt someone."

1 RP (Jan. 4, 2023) at 318-19. These statements were not an opinion that Mr. Tate was

guilty, or what his intent was at the time. Rather, Ms. Rafaela, a lay witness, was simply

attempting to explain what she witnessed in the parking lot of the convenience store. Her

perception of the events was properly allowed and did not include impermissible opinion

testimony.

### *Sergeant Todd Sharpe*

Mr. Tate claims Sergeant Todd Sharpe offered impermissible opinion testimony

regarding the credibility of Robert Fleming. Mr. Tate argues Sergeant Sharpe testified

that he concluded there was probable cause to arrest Mr. Tate after speaking with

Mr. Fleming. The State responds that the testimony regarding probable cause to arrest

Mr. Tate had nothing to do with the credibility of Mr. Fleming.

An officer may testify regarding protocol utilized or finding probable cause to

make an arrest, as this does not improperly comment of the truthfulness or credibility

of another witness. *See Kirkman*, 159 Wn.2d at 934 ("A detective's testimony as to the

protocol utilized in interviews only provides context for the interview . . . and does not

improperly comment [on] the truthfulness of the victim."); *State v. Sutherby*, 138 Wn.

App. 609, 617, 158 P.3d 91 (2007) ("In some instances, a witness who testifies to [their] belief that the defendant is guilty is merely stating the obvious, such as when a police officer testifies that [they] arrested the defendant because [they] had probable cause to believe [the defendant] committed the offense."), *aff'd*, 165 Wn.2d 870, 204 P.3d 916 (2009).

Here, Sergeant Sharpe testified there was reasonable suspicion to pull over the vehicle and, after speaking with Officer George and then subsequently Mr. Fleming, he believed probable cause existed to arrest Mr. Tate for an assault. Sergeant Sharpe was referring to the traffic stop and why he found probable cause to arrest Mr. Tate. The comment was stating the obvious—Mr. Tate was arrested because the officers had probable cause to believe he committed an offense. Furthermore, the jury knew that Mr. Tate had been arrested because recordings of his phone calls while in jail were played at trial. For these reasons, Sergeant Sharpe's testimony that he spoke to Mr. Fleming, a witness, and found probable cause to arrest Mr. Tate is not a manifest error of constitutional magnitude.

*Lieutenant David Jansen*

Mr. Tate claims that Lieutenant David Jansen's statements were impermissible opinion testimony concerning both Mr. Tate's guilt and Ms. Larson's credibility. Mr. Tate avers the statement of Lieutenant Jansen that "'it was very clear that an assault

had taken place,'" was a comment on his guilt. Br. of Appellant at 33-34 (quoting 2 RP

(Jan. 6, 2023) at 856). Mr. Tate also claims Lieutenant Jansen's statement about not

receiving "'the full truth'" was an opinion on Kathy Larson's credibility. Br. of

Appellant at 34 (quoting 2 RP (Jan. 6, 2023) at 856). The State counters that Lieutenant

Jansen's "full truth" statement was speaking to the general reluctance of domestic

violence victims to report abuse.

Lieutenant Jansen testified that Kathy Larson had denied multiple times that any

assault occurred. Despite Ms. Larson's denials, Lieutenant Jansen and other officers still

determined there was probable cause to arrest Mr. Tate for domestic violence assault.

Lieutenant Jansen further testified that it is not unheard of for domestic violence victims

to not want to get their partner in trouble, and "[i]t's pretty frequent that we don't receive

the full truth from them." 2 RP (Jan. 6, 2023) at 856. He then stated that "in this case, it

was pretty clear that an assault had taken place because [Kathy Larson] had injuries of

red marks [on] her chest. Her clothes were pulled down. There was blood in the backseat.

Officers [observed] blood on Mr. Tate's hand." *Id.*

Here, Lieutenant Jansen was explaining why there was probable cause to arrest

Mr. Tate despite Ms. Larson's insistence that no assault had occurred. After making

the above-mentioned statements, Lieutenant Jansen further testified that, when an

independent witness with no personal stake in the outcome reports an alleged assault,

law enforcement intervention is required, even in the face of an alleged victim's denial that an assault took place. He was not referring to Mr. Tate's guilt or the credibility of Ms. Larson's stipulated testimony. Instead, he was referring to his knowledge of the events surrounding this incident and why the officers had probable cause to arrest Mr. Tate, despite Ms. Larson's denial that she had been assaulted. Lieutenant Jansen's testimony regarding domestic violence victims (in general) and probable cause (specific to this case) does not constitute a manifest error of constitutional magnitude triggering review for the first time on appeal.

### *Officer James George*

Mr. Tate claims Officer James George made several statements that were impermissible opinion testimony. Mr. Tate claims that Officer George offered an opinion on guilt and the credibility of other officers involved in this case, and that Officer George weaponized the racial dynamics of the case by implying that Black people, like Mr. Tate, cannot be trusted to identify and react to racism.

First, Mr. Tate claims Officer George's statements that the officers "'knew'" that an assault had taken place and "he 'believed the gun belonged to [Mr. Tate], that's why [Officer George] arrested him'" were both impermissible testimony regarding Mr. Tate's guilt. Br. of Appellant at 34-35 (alterations in original) (quoting 2 RP (Jan. 5, 2023) at 559, 692).

Officer George was testifying about the difference between a normal traffic stop and a high-risk traffic stop, and due to the circumstances at the Towne Crier and the reported assault, how Mr. Tate's traffic stop was viewed as high risk, stating:

> For this situation, it was a higher-risk situation because we saw—it was the same car. We knew that. Someone had just been assaulted and involved in this car. So, there's that information that we're going to follow up. We saw how angry just, you know, how disruptive Mr. Tate was minutes prior to this, and, you know, those are all the things we have to take into account whether— if we stop this car what is going to happen when we talk to the occupants? Are we gonna get shot at? Are we gonna get in a fight? Are they gonna take off?

2 RP (Jan. 5, 2023) at 559.

Here, Officer George was describing the protocol and purpose for approaching the stop as a "high-risk situation" that would involve more than one officer. This was not an impermissible statement regarding Mr. Tate's guilt.

When Officer George was asked if he had information that the firearm found in the backpack may have belonged to someone else other than Mr. Tate, his testimony revealed the following:

> A. During the case and while we were investigating it?
> Q. Is the case concluded?
> A. Well, since then we're here now. That case happened a long time ago, but during the day or two when I was investigating this case, I believed [the gun] was Marvin Tate's. That's why I wrote it in my report. That's why I arrested him for it. All the evidence pointed in that direction.

*Id.* at 692.

41

Here, the testimony is consistent with the evidence in this case that, inside of the backpack where the firearm was located, several items, including mail, pointed to the bag belonging to Mr. Tate. It was a reasonable response to defense counsel's question because Officer George had evidence at the time the backpack was searched to believe the firearm belonged to Mr. Tate. This comment was not regarding the guilt of Mr. Tate, it was based on the evidence at the time that indicated the firearm belonged to Mr. Tate.

In summary, Officer George's above statements were not impermissible opinion testimony regarding Mr. Tate's guilt, and they do not constitute manifest error of constitutional magnitude.

Second, Mr. Tate claims that Officer George made statements vouching for the credibility of other police officers involved in the case when he described them as "'the people [he] can trust' and opined that 'whatever is documented in a police report is the truth.'" Br. of Appellant at 35-36 (alteration in original) (quoting 2 RP (Jan. 5, 2023) at 634).

Here, defense counsel, after a long sequence of questioning, accused Officer George of having no personal knowledge as to what happened to Mr. Tate's vehicle from the time Mr. Tate was taken into custody until the time Officer George examined the vehicle the next day. Officer George claimed that defense counsel was incorrect, and that even though Officer George did not personally follow the vehicle to impound, he had

42

confidence in what happened to it because other officers report what they do with evidence. He further stated that "those are the people that I trust and what is written in the reports is factual." 2 RP (Jan. 5, 2023) at 634-35.

Standing alone, this testimony could be viewed as explanation of internal police evidence procedures. However, his statement that "those are the people that I trust," *id.* at 634, must be viewed in the context of Officer George's testimony as a whole. And when doing so, as discussed below, this statement becomes much more problematic.

Third, Mr. Tate claims that Officer George expressed his disdain "for 'people like Mr. Tate,' whose criticisms of police racism he dismissed as a 'worn[-]out record.'" Br. of Appellant at 36 (quoting 2 RP (Jan. 5, 2023) at 689). Mr. Tate argues these statements were explicit opinions about the veracity of witnesses and the accused. He further argues that the testimony appealed to a racist stereotype that Black people who are vocal about racism they experience are lying or exaggerating and cannot be trusted. The State responds that defense counsel was inquiring into the integrity of Officer George by asking whether he would only collect inculpatory evidence, and that Officer George was answering the question regarding his fairness as a police officer.

We agree that defense counsel was inquiring into the integrity of Officer George when asking several questions about whether he only collects inculpatory evidence and claiming that Officer George's biases and prejudices may have impacted his investigation

43

into this matter. Additional context is helpful in analyzing the testimony. On direct

examination, Officer George made the following statements regarding Mr. Tate's

behavior at the Towne Crier:

> Q. So, after the screaming and yelling, what did you and the officers do next?
> A. . . . .
> . . . .
> They had driven up next to me to talk to me. I talked to 'em for several minutes. I was talking. I was trying to deescalate them. They continued to pretty much berate me and the other officers on scene, calling us racist cops who only want to kill black people. Kind of generally not about the specific situation that was there, the brawl. *It was just police nationwide as a whole*.
> At that time, that *was the ramp-up towards that whole narrative exploding nationwide*, and that was goin' on and I was trying to calm them down about it and answer any questions they may have.
> Q. When you say "they" who are you referring to?
> A. Mostly Marvin [Tate] and Kathy [Larson], and I believe Robert [Andrews) was part. He was the driver. He was part of the conversation, but I specifically remember dealing with trying to answer Marvin's questions as well as Kathy's.

*Id.* at 553-54 (emphasis added). Later, on recross-examination, Officer George stated the

following after defense counsel claimed Officer George had prejudice as a police officer:

> A. If you're implying that there's any ill will goin' in my investigation or if I have any particular prejudices towards [Mr. Tate], you're absolutely wrong. I do not -- *that narrative has been worn out over the past couple years*, and frankly I'm sick and tired of it.
> I know who I am. I know my integrity. I know why I'm in this job. I know I'm not a liar. I'm not a racist. *Even though I get told that way too often by people like Mr. Tate, that is not—that isn't what it is. It's a worn-out record at this point*, and I'm not gonna stand up for it here either.

44

*Id.* at 688-89 (emphasis added).

The statements that "even though I get told that way too often by people like Mr. Tate" and "it's a worn-out record," *id*., are not appropriate responses, especially considering Officer George first referenced the racist police "narrative exploding nationwide." *Id*. at 554. Officer George inserted these defensive opinions of his own accord. The question asked by defense counsel did not ask Officer George about his opinion of Mr. Tate, and the "worn-out record" phrase can be construed to mean he is told way too often by Black individuals, who may have distrust in police officers, that he is a racist officer who wants to kill Black people. As previously mentioned, a police officer's testimony carries an aura of reliability, and their expertise is determining when an arrest is justified. To discredit Mr. Tate's apparent distrust in police officers by claiming it is a "worn-out record" is problematic.

Furthermore, similar distrust and statements toward Officer George were made by both of Mr. Tate's witnesses—Kathy Larson and Robert Andrews, at the Towne Crier, which can be inferred that their comments were also a "worn-out record" regarding distrust in law enforcement. We also note Mr. Andrews testified that his race is Hispanic and Black and "[f]rom all [of his] knowledge and growin' up [in Richland], [the members of the Richland Police Department are] racist—they're just super racist." 2 RP (Jan. 6,

2023) at 952. The statements made by Officer George carry an aura of reliability, and to claim that Mr. Tate's concerns, and by inference the beliefs of witnesses called by Mr. Tate, regarding police racism are a "worn-out record" can be viewed as highly prejudicial.

> As Mr. Tate points out:
>
> These statements were explicit opinions about the veracity of witnesses and the accused. And troublingly, they weaponized the racialized dynamics of the case against Mr. Tate. Officer George's testimony implied that "people like Mr. Tate"—in other words, Black people—cannot be trusted if they identify and react to racism. This an iteration of "playing the race card," a trope used to minimize and dismiss claims of racism. See David Schraub, Playing With Cards: Discrimination Claims and the Charge of Bad Faith, SOCIAL THEORY AND PRACTICE, 285-303 (Apr. 2016) (accusations of bad faith in response to claims of bias or discrimination allow dominant group to avoid substantive engagement); Charles M. Blow, Stop Playing the 'Race Card' Card, THE NEW YORK TIMES (Mar. 19, 2015), https://www.nytimes.com/2015/03/19/opinion/charles-blow-stop-playing-the-race-card-card.html. Officer George's remarks appealed to a racist stereotype that Black people who are vocal about the racism they experience are lying or exaggerating and cannot be trusted.

Br. of Appellant at 36-37. Officer George's statements of "people like Mr. Tate" and "worn-out record," were inappropriate and constitute impermissible opinion testimony regarding the veracity of Mr. Tate, Mr. Andrews, and Ms. Larson. Further, these opinions could have impacted Mr. Tate's constitutional right to a fair trial. We must, therefore, determine whether the error was manifest such that it demonstrated actual prejudice.

*Manifest error*

Having determined that the opinion testimony of Robert Fleming and Officer

James George rises to the level of constitutional magnitude, we must determine if the

error was manifest.

Mr. Tate claims that the impermissible opinion testimony described above was

explicit or nearly explicit and was not isolated to a single remark or single witness.

He claims that it permeated the trial and the volume and repetitive nature of

impermissible testimony made it impossible for jurors to ignore. The State argues

that none of the statements were manifest error, and asks this court to decline review

of Mr. Tate's claim.

"RAP 2.5(a)(3) does not permit *all* asserted constitutional claims to be raised

for the first time on appeal, but only certain questions of 'manifest' constitutional

magnitude." *Kirkman*, 159 Wn.2d at 934 (citing *State v. Scott*, 110 Wn.2d 682, 687, 688,

757 P.2d 492 (1988)). "This court has rejected the argument that all trial errors which

implicate a constitutional right are reviewable under RAP 2.5(a)(3), noting that '[t]he

exception actually is a narrow one, affording review only of 'certain constitutional

questions.'" *Id.* (alteration in original) (quoting *Scott*, 110 Wn.2d at 687). "Exceptions

to RAP 2.5(a) must be construed narrowly." *Id*. at 935.

"Appellate courts will not approve a party's failure to object at trial that could identify error which the trial court might correct (through striking the testimony and/or [giving a] curative jury instruction)." *Id.* at 935 (citing *Scott*, 110 Wn.2d at 685). "Failure to object deprives the trial court of this opportunity to prevent or cure the error. The decision not to object is often tactical. If raised on appeal only after losing at trial, a retrial may be required with substantial consequences." *Id.* (citing *State v. Madison*, 53 Wn. App. 754, 762-63, 770 P.2d 662 (1989)).

"Admission of witness opinion testimony on an ultimate fact, without objection, is not automatically reviewable as a 'manifest' constitutional error. 'Manifest error' requires a nearly explicit statement by the witness that the witness believed the accusing victim. Requiring an explicit or almost explicit witness statement on an ultimate issue of fact is consistent with our precedent holding the manifest error exception is narrow." *Id.* at 936 (citing *State v. WWJ Corp.*, 138 Wn.2d 595, 603, 980 P.2d 1257 (1999)).

The first issue is whether Robert Fleming's statement that Mr. Tate "had an intent to hurt [Kathy Larson]," 1 RP (Jan. 4, 2023) at 299, is a reviewable manifest error. Mr. Fleming was a witness to the events in the convenience store parking lot. Here, this statement was regarding the intent of Mr. Tate, and whether an assault occurred was an ultimate issue. Furthermore, the statement was an explicit or almost explicit witness statement.

But in order to determine if the error was manifest, there must be a showing of actual prejudice. *See O'Hara*, 167 Wn.2d at 99. Mr. Tate must make a plausible showing that the asserted error had a practical and identifiable consequence in the trial of this case. Mr. Tate has failed to show, in isolation, how this error had a practical and identifiable consequence. Even if he had, there is substantial evidence that the jury could have concluded Mr. Tate was guilty of an assault without hearing Mr. Fleming's statement regarding intent.

Here, Mr. Fleming had already testified that he heard screams after every swing Mr. Tate threw at Ms. Larson. He also testified that he observed Mr. Tate hit Ms. Larson between three or four times and that Mr. Tate was reaching into the vehicle "puttin' his hands on [her]." 1 RP (Jan. 4, 2023) at 281. Furthermore, several witnesses testified that neither Mr. Tate nor Ms. Larson displayed any injuries while at the Towne Crier, but after the incident at the convenience store a short time later Mr. Tate had blood on his hands and knuckles, and Ms. Larson had red marks on her chest and neck area and that her breast was partially exposed. Lastly, Gladys Rafaela, also a witness to the events at the convenience store, heard a woman scream in distress while a male was reaching into the back passenger seat of the vehicle, which appeared to Ms. Rafaela that someone was physically trying to reach into the vehicle and hurt someone.

49

Moreover, the trial court instructed the jury that they were the "sole judges of credibility of each witness" and "the value or weight to be given to the testimony of each witness." CP at 68. "Juries embody the 'commonsense judgment of the community.'" *Kirkman*, 159 Wn.2d at 938 (quoting *Taylor v. Louisiana*, 419 U.S. 522, 530, 95 S. Ct. 692, 42 L. Ed. 2d 690 (1975)). "Only with the greatest reluctance and with clearest cause should judges—particularly those on appellate courts—consider second-guessing jury determinations or jury competence. As Judge Learned Hand wrote, 'Juries are not leaves swayed by every breath.'" *Id.* (quoting *United States v. Garsson*, 291 F. 646, 649 (S.D.N.Y. 1923)). Here, the jury could use their commonsense, regardless of the comment by Mr. Fleming on the intent of Mr. Tate, that an assault occurred based on all of the evidence in this case. For these reasons, there was no practical and identifiable consequence at trial, and we would decline to review this claim in isolation as a manifest error.

The second issue is whether Officer George's statements about "people like Mr. Tate" and a "worn-out record," 2 RP (Jan. 5, 2023) at 689, are a reviewable manifest error. Mr. Tate argues that Officer George's statements appeal to racial bias and, when impermissible opinion testimony appeals to racial bias, the court should presume it is prejudicial. As Mr. Tate points out, this court recently stated:

Bias impacts everyone. *State v. Horntvedt*, 29 Wn. App. 2d 589, 599[, 539 P.3d 869] (2023). Appeals to bias not only undermine the integrity of the judicial system, they distort the deliberative process. *State v. Horntvedt*, 29 Wn. App. 2d 589, 600 (2023). The distortive power of racial bias applies to all human decision-making processes. *State v. Horntvedt*, 29 Wn. App. 2d 589, 599 (2023). Thus, racial bias odiously infects a jury's deliberations. *State v. Horntvedt*, 29 Wn. App. 2d 589, 599 (2023). *Even the simplest racial cues can trigger implicit biases* that affect decision-making more so than even explicit references to race. *State v. Bagby*, 200 Wn.2d 777, 795[, 522 P.3d 982] (2023).

*We do not serve fairness when we speculate on the extent to which the specter of racism actually impacted thought processes. State v. Horntvedt*, 29 Wn. App. 2d 589, 599 (2023). The impact on human behavior of an appeal to racial bias cannot be measured. *State v. Bagby*, 200 Wn.2d 777, 802-03 (2023).

*In re Pers. Restraint of Skone*, 30 Wn. App. 2d 1, 40-41, 543 P.3d 842 (2024) (emphasis added), *review denied*, No. 103405-9 (Wash. Apr. 7, 2025).

Officer George's testimony was improper and may have triggered implicit racial bias. "'[T]he right to a fair trial that is free of improper racial implications is so basic to the federal Constitution that an infringement upon that right can never be treated as harmless error.'" *Bagby*, 200 Wn.2d at 803 (alteration in original) (quoting *State v. Monday*, 171 Wn.2d 667, 683, 257 P.3d 551 (2011) (Madsen, C.J., concurring). We will not speculate as to the extent implicit racial bias may have impacted the jury's thought process.

In summary, while Mr. Fleming's testimony was not a manifest error, Officer

George's statements were inappropriate and can be seen as, at minimum, a racial cue that

may have triggered implicit bias. These statements are also made more offensive

when contrasted with Officer George's other testimony regarding the integrity and

trustworthiness of his law enforcement colleagues.

*Other alleged errors*

Mr. Tate also asserts that his convictions should be reversed based on claims of

prosecutorial misconduct, ineffective assistance of counsel, and cumulative error. We

decline to address these other claimed errors because the constitutional issue of implicit

racial bias is dispositive. *Clark County v. W. Wash. Growth Mgmt. H'rgs Bd.*, 177 Wn.2d

136, 145, 298 P.3d 704 (2013) ("The court must address only those claims and issues

necessary to properly resolving the case as raised on appeal by interested parties.").

CONCLUSION

Mr. Tate's conviction for use of drug paraphernalia was time barred because the

amended count broadened the original charge of unlawful possession of a controlled

substance. As such, that conviction is reversed with prejudice.

Because Mr. Tate's trial was polluted with opinions that may well have invoked

implicit racial bias, his remaining convictions are also reversed, but without prejudice.

52

The judgment and sentence is reversed and we remand for further proceedings. In the event of any future conviction, a VPA should not be imposed should Mr. Tate remain indigent.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Johnson, J.P.T.

WE CONCUR:

Lawrence-Berrey, C.J.

Cooney, J.